969 F.2d 54
 15 Employee Benefits Cas. 1865
 Joanne W. COLEMAN, Plaintiff-Appellee,
v.
NATIONWIDE LIFE INSURANCE COMPANY, Defendant & Third-Party
Plaintiff Appellant,
v.
ROOFING CONCEPTS, INCORPORATED, Third-Party Defendant.
Joanne W. COLEMAN, Plaintiff-Appellant,
v.
NATIONWIDE LIFE INSURANCE COMPANY, Defendant-Appellee,
v.
ROOFING CONCEPTS, INCORPORATED, Third-Party Defendant.
 Nos. 91-2646, 91-2652.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 8, 1992.
Decided July 1, 1992.
As Amended July 17, 1992.
 
 Edwin Lewis Kincer, Jr., Mezzullo & McCandlish, Richmond, Va., argued (David D. Hopper, on the brief), for appellant.
 John Bertram Mann, Levit & Mann, Richmond, Va., argued, for appellee.
 Before WILKINSON, HAMILTON, and LUTTIG, Circuit Judges.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 In this case plaintiff seeks benefits under a group health insurance plan, the award of which would violate important provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Plaintiff Joanne Coleman seeks to recover under a contract between her husband's employer and Nationwide Life Insurance Company, which had terminated automatically due to the employer's failure to pay the premiums. Coleman has offered the court three rationales for ruling in her favor. First, she contends that while the contract of insurance gave the right to cancel the policy for nonpayment of premiums, such cancellation required an affirmative act by Nationwide and could not be exercised retroactively. Second, she urges by way of estoppel that statements made to her by Nationwide personnel indicating that she had coverage preclude Nationwide from denying her benefits due to the termination of the plan. Finally, she argues that Nationwide breached its fiduciary duty under ERISA by failing to notify plan beneficiaries that her husband's employer had not paid the necessary premiums to keep the policy in force.
 
 
 2
 At first glance, these appear to be three unrelated theories of recovery, but acceptance of any of them would require this court to rewrite the contract of insurance. While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan. Plaintiff's theories, though packaged in different wrappers, all would lead to the same result--the written plan would no longer be the benchmark in an action under ERISA. Accordingly, we must reverse the judgment of the district court and direct it to dismiss the complaint.
 
 I.
 
 3
 Plaintiff Joanne Coleman and her husband participated in a group health insurance plan sponsored by her husband's employer, Roofing Concepts, Inc. After terminating its group health coverage with another insurer in late 1988, Roofing Concepts was issued a group health policy by Nationwide Life Insurance Company, which took effect on November 1, 1988. The Nationwide policy fell within ERISA's definition of an employee welfare benefit plan, and was thereby subject to regulation under the statute. 29 U.S.C. § 1002(1). The plan documents consisted of the insurance policy and Roofing Concepts' application.
 
 
 4
 In the contract of insurance, Roofing Concepts agreed to pay 100 percent of the premiums due on the policy. The written provisions of the plan also stated that the policy would "continue for as long as premiums are paid or until it is cancelled." The plan allowed for a 31-day grace period after a premium due date, during which time insurance coverage would continue for the plan participants. The policy provided, however, that "[i]f all the premium is not paid prior to the expiration of the grace period, the Policy will terminate on the last day of the grace period."
 
 
 5
 Roofing Concepts defaulted on its payments almost from the start. At the time of its application to Nationwide, Roofing Concepts paid a premium deposit of $3665.63, which equaled the estimated premium on the policy for the first month. Nationwide's underwriters thereafter calculated the actual monthly premium to be $3709.42, $43.79 more than Roofing Concepts' deposit. Nationwide billed Roofing Concepts for this difference, which was due on November 1, 1988. Roofing Concepts, however, never paid the $43.79, nor did it ever make another monthly premium payment. Roofing Concepts also failed to notify its employees that it had ceased paying the premiums on the policy.
 
 
 6
 Roofing Concepts went out of business on February 15, 1989. On February 16, Roofing Concepts informed Nationwide of this event and asked Nationwide to cancel the health insurance policy. On March 6, 1989, Nationwide sent a reply letter indicating that because Roofing Concepts had paid no premiums except for the initial deposit, the policy was cancelled as of its effective date, November 1, 1988.
 
 
 7
 Plaintiff Coleman was pregnant at the time of the Nationwide policy's inception. In response to a telephone inquiry, Coleman received a letter from a Nationwide account representative dated December 1, 1988, which included her policy number as well as a brief summary of group benefits. On December 5, 1988, Coleman was sent an authorization for a two-day hospital stay for her childbirth that she requested from Capp Care, a cost containment organization paid by, but not affiliated with, Nationwide. The authorization letter contained the following disclaimer: "CAPP CARE'S AUTHORIZATION OF ADMISSION, CONTINUED STAY OR SURGICAL PROCEDURE DOES NOT GUARANTEE PAYMENT. PAYMENT IS ALSO SUBJECT TO ELIGIBILITY AND COVERAGE AT THE TIME SERVICES ARE RENDERED AND MUST BE VERIFIED BY THE EMPLOYER OR INSURANCE CARRIER."
 
 
 8
 Coleman claims in her affidavit that she was advised by unnamed Nationwide employees on several occasions after December 1, 1988 that she had coverage. In her deposition, however, Coleman indicated that the only time she spoke to Nationwide personnel between December 1 and the birth of her child was in January 1989 when she was told during a telephone inquiry that a tubal ligation would be covered by the policy. Coleman did contend that she spoke to Capp Care employees on numerous occasions during the same time period regarding her authorization for hospitalization.
 
 
 9
 Coleman gave birth to a son on January 25, 1989. Although Nationwide paid two of the medical expenses associated with the childbirth totalling $481.60, it notified Coleman in a letter dated March 27, 1989, that the bulk of her expenses would not be paid because her coverage had been cancelled as of November 1, 1988. These uncovered expenses totalled $6976.07. When Coleman's husband contacted Kenneth Harris, president of Roofing Concepts, to find out why the policy had been cancelled, Harris professed ignorance despite the fact that he had signed the February 16 letter to Nationwide requesting the cancellation of coverage.
 
 
 10
 Coleman filed this suit against Nationwide on January 12, 1990, seeking payment of the medical expenses plus attorney's fees. Both parties subsequently filed motions for summary judgment. On October 16, 1990, the district court denied Nationwide's motion for summary judgment and granted Coleman's on alternative theories of estoppel and breach of fiduciary duty. 748 F.Supp. 429 (E.D.Va.1990). After Nationwide filed a motion to alter or amend the judgment, the district court on July 18, 1991, reversed its earlier ruling that plaintiff was entitled to judgment on an estoppel theory. The court, however, upheld the grant of summary judgment for Coleman on fiduciary duty grounds. Both parties now appeal to this court.
 
 II.
 
 11
 Coleman argues that she was covered under the health insurance plan because Nationwide had no right to retroactively cancel her benefits. Although she apparently concedes that the failure of Roofing Concepts to pay the policy premiums gave Nationwide the right to cancel the policy, she contends that her coverage was in full force and effect when her child was born because Nationwide had taken no affirmative action to cancel the policy as of that time.
 
 
 12
 We believe, however, that Coleman misreads the plain language of the policy, which provides for automatic termination of the coverage if the policy's grace period expires without payment of an overdue premium having been made. The written plan expressly states that "[i]f all the premium is not paid prior to the expiration of the grace period, the Policy will terminate on the last day of the grace period" (emphasis added). The policy also states that coverage "will continue for as long as premiums are paid or until it is cancelled." Thus, the policy itself draws a distinction between automatic termination if Nationwide is not paid a premium and a cancellation for some other reason. On the facts of this case, Coleman's coverage terminated no later than December 2, 1988, when the grace period for payment of the $43.79 portion of the November premium expired. The language of this plan indicating that coverage terminates automatically for failure to pay premiums is unambiguous. Courts are not at liberty to disregard the plain language of a plan in order to demand that insurers provide coverage for which no premium has been--or ever will be--paid.[1]
 
 
 13
 Attempts to circumvent this policy language on behalf of an admittedly appealing plaintiff would regrettably reprove the adage that hard cases make bad law. For example, adoption of Coleman's position that the insurer has to make some affirmative acknowledgment of termination in order for such termination to have effect would not only conflict with the plain language of the plan, but might also inure to the detriment of beneficiaries in the long run. An insurer that has an automatic termination provision in its policy is not presently precluded from making the business decision to accept payment of premiums after the grace period has expired and to treat the policy as an uninterrupted one. The decision to do this, of course, does not alter the terms of the contract, but it certainly works to the benefit of plan participants whose coverage would remain in effect. Coleman's affirmative acknowledgment rule would create an incentive for an insurer to declare a policy terminated as soon as the grace period expires in order to protect its rights. Once such a declaration is made by the insurer, tendering and acceptance of the overdue premiums to reinstate the policy seem less likely to occur. Consequently, plan participants as a whole are likely to be harmed by Coleman's rule.
 
 
 14
 Coleman's additional contention that the automatic termination provision constitutes an illegal "escape" clause also misses the mark. She seems to suggest that a termination clause such as this is unenforceable because it disrupts legitimate expectations of coverage or renders the insurer's promise of coverage illusory. A contractual provision such as the one at issue here that conditions performance upon payment, however, is the essence of consideration and is in no way improper or unconscionable. See, e.g., American Family Mut. Ins. Co. v. Jones, 739 F.2d 1259, 1262 (7th Cir.1984).
 
 III.
 
 15
 Coleman next argues that Nationwide is estopped from denying her the requested medical benefits. She alleges that at various points between December 1, 1988, and the birth of her child, Nationwide employees and agents indicated that she was still covered by the Roofing Concepts health insurance policy. She claims that these representations estop Nationwide from asserting that her coverage had terminated pursuant to the terms of the plan and that, as a result of this estoppel, she is entitled to payment of her medical expenses notwithstanding the plan's plain language.
 
 
 16
 Although Coleman apparently concedes that a state common law cause of action based upon equitable estoppel has been preempted by ERISA, see 29 U.S.C. § 1144; Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1146-47 (4th Cir.1985), aff'd mem. sub nom. Brooks v. Burlington Indus., Inc., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986), she nonetheless contends that these very same estoppel principles may be imported into ERISA in the name of federal common law. Federal common law, however, does not grant federal courts "carte blanche authority to 'use state common law to re-write a federal statute.' " Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 992 (4th Cir.1990) (quoting Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir.1986)).
 
 
 17
 Use of estoppel principles to effect a modification of a written employee benefit plan would conflict with "ERISA's emphatic preference for written agreements." Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir.1989). The statute requires that all ERISA plans be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and that the written instrument describe the formal procedures by which the plan can be amended, id. § 1102(b)(3). Based upon this statutory scheme, any modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing. Oral or informal written modifications to a plan, such as those alleged by Coleman in this case, are of no effect. Equitable estoppel principles, whether denominated as state or federal common law, have not been permitted to vary the written terms of a plan. Indeed, this circuit has said that "resort to federal common law generally is inappropriate when its application would ... threaten to override the explicit terms of an established ERISA benefit plan." Singer v. Black & Decker Corp., 964 F.2d 1449, 1452 (4th Cir.1992); accord Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 n. 10 (3d Cir.1990); Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1296-97 (5th Cir.1989); Musto v. American Gen. Corp., 861 F.2d 897, 910 (6th Cir.1988); Straub v. Western Union Tel. Co., 851 F.2d 1262, 1265-66 (10th Cir.1988); Nachwalter, 805 F.2d at 959-61; see also Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 120 (4th Cir.1989) (rejecting claims because "they rest on an allegation that the pension plan was modified by informal and unauthorized amendment which, as a matter of law, is impermissible").
 
 
 18
 In an effort to avoid the prohibition against using equitable estoppel to modify the written terms of a plan, Coleman claims that Nationwide's statements constituted an interpretation, not a modification, of the written plan. Based upon this construction of the facts, she argues that we should adopt the view of the Eleventh Circuit that estoppel principles may be invoked in ERISA cases when the statements at issue are interpretations of ambiguous plan provisions. See National Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc., 929 F.2d 1558, 1571-72 (11th Cir.1991); Kane v. Aetna Life Ins., 893 F.2d 1283, 1286 (11th Cir.1990). We need not decide whether we agree with the view of the Eleventh Circuit, however, because this case involves an outright modification, not an interpretation of the plan. In Kane, the Eleventh Circuit recognized that "estoppel may not be invoked to enlarge or extend the coverage specified in a contract." 893 F.2d at 1285 n. 3. In this case, estopping Nationwide from terminating the contract of insurance when no premiums were paid would have the effect of providing Coleman benefits even though the contract unambiguously indicates that she was entitled to none. We can only regard such a result as a modification of the plan's termination provision and, therefore, as being in direct conflict with the statutory requirements.
 
 
 19
 We are unpersuaded by Coleman's view that estoppel principles are available in cases involving employee welfare benefit plans, but not in pension plan cases. According to Coleman, the reason for denying use of equitable estoppel principles in pension plan cases is to protect the actuarial soundness of those plans. See Armistead v. Vernitron Corp., 944 F.2d 1287, 1300 (6th Cir.1991); Black v. TIC Inv. Corp., 900 F.2d 112, 115 (7th Cir.1990). Since welfare benefit plans are unfunded and lack the stringent accrual and vesting requirements of pension plans, Coleman believes the reason for not allowing estoppel is absent.
 
 
 20
 We do not think, however, that the statutory emphasis on adherence to the written terms of ERISA plans leaves room for this distinction between pension and welfare benefit plans. Section 1102 requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1) (emphasis added), and the requirement that formal amendment procedures be included in the written document similarly applies to "[e]very employee benefit plan," id. § 1102(b). According to ERISA's definition, the term "employee benefit plan" includes both welfare benefit and pension plans. Id. § 1002(3). We also note that Congress knew how to exempt welfare benefit plans from ERISA requirements when it wished to do so. See id. § 1051(1) (exempting welfare benefit plans from ERISA's participation and vesting requirements); id. § 1081(1) (exempting welfare benefit plans from ERISA's funding requirements); Hozier, 908 F.2d at 1164 (noting these provisions); see also Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir.1988) (refusing to apply estoppel to case involving informal modification of welfare benefit plan). Given the language of the statute, we are unable to discern any basis for holding that estoppel principles are available to effectively amend the written terms of a welfare benefit plan. Indeed, in rejecting the view that common law estoppel is freely available to modify ERISA plans, this circuit has drawn no distinction between pension and welfare benefit plans. See Salomon v. Transamerica Occidental Life Ins. Co., 801 F.2d 659, 660-61 (4th Cir.1986) (monthly income benefit plan); Holland, 772 F.2d at 1147 (severance pay plan).
 
 
 21
 We also note that several important purposes of ERISA would be impeded through use of estoppel principles in welfare benefit plan cases. ERISA is designed "to promote the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), as well as "to protect contractually defined benefits," Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). It requires a crabbed reading of these purposes to suggest that they are directed solely at the actuarial soundness of pension plans. Indeed, the Seventh Circuit has recently recognized that "[o]ne of ERISA's purposes is to protect the financial integrity of pension and welfare plans by confining benefits to the terms of the plans as written." Pohl v. National Benefits Consultants, Inc., 956 F.2d 126, 128 (7th Cir.1992) (emphasis added). The financial integrity of a group health insurer could be quickly compromised if courts compelled the insurer to assume risks for which no premium was ever paid. Moreover, if courts allowed estoppel to be used to modify ERISA plans, plan assets could also be chewed up in costly, litigious disputes over what informal modifications may have been made to a written instrument.[2]
 
 
 22
 In sum, we think the district court was correct to conclude that estoppel was unavailable to alter the unambiguous terms of an ERISA welfare benefit plan.
 
 IV.
 A.
 
 23
 In entering summary judgment in Coleman's favor, the district court accepted her theory that Nationwide owed her benefits due to a breach of fiduciary duty. The alleged breach stems from Nationwide's failure to notify all plan beneficiaries that Roofing Concepts had threatened their eligibility for benefits due to the failure to pay premiums. We believe, however, that in concluding that Nationwide was a fiduciary who had committed a breach, the district court failed to follow the allocation of responsibilities that the plan documents themselves provided.
 
 
 24
 Before one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of "fiduciary." The statute defines the term as follows:
 
 
 25
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 26
 29 U.S.C. § 1002(21)(A). As the basis for its conclusion that this definition had been satisfied, the district court made the broad assertion that "Nationwide possessed considerable authority, discretion and administrative control with respect to the plan." 748 F.Supp. at 432.
 
 
 27
 We believe the district court's conclusion that Nationwide was a "fiduciary" failed to come to terms with the statutory definition. The district court seemed to regard fiduciary status as an all-or-nothing concept. However, the inclusion of the phrase "to the extent" in § 1002(21)(A) means that a party is a fiduciary only as to the activities which bring the person within the definition. The statutory language plainly indicates that the fiduciary function is not an indivisible one. In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue. See, e.g., 29 C.F.R. § 2509.75-8, FR-16 (1991); Licensed Div. Dist. No. 1 MEBA/NMU v. Defries, 943 F.2d 474, 477-78 (4th Cir.1991); Hozier, 908 F.2d at 1158; Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir.1987); Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc., 793 F.2d 1456, 1459-60 (5th Cir.1986); Leigh v. Engle, 727 F.2d 113, 133 (7th Cir.1984).
 
 
 28
 The discretionary authority or responsibility which is pivotal to the statutory definition of "fiduciary" is allocated by the plan documents themselves. Cf. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (looking to plan documents to determine whether plan administrator exercised discretionary powers in interpreting plan provisions). In this case, we must ask whether Nationwide possessed discretionary authority or responsibility to notify all plan beneficiaries of circumstances, such as the failure of a plan sponsor to pay policy premiums, that would affect the availability of benefits to all. Nothing in the plan itself suggests that Nationwide has any authority or responsibility to provide such notification. Indeed, Nationwide is not directed by the plan to provide notice to all beneficiaries under any circumstances. To the extent that the relevant documents make an allocation of a duty to provide notification of major changes or events, that duty plainly rests with Roofing Concepts. In its preliminary application for insurance, Roofing Concepts agreed as plan sponsor to assume notice and recordkeeping responsibilities in accordance with the terms of the policy. Consistent with this view, the final policy also assigned notice and recordkeeping responsibilities to Roofing Concepts, including the obligation to keep complete records with regard to each person's insurance, to distribute to each eligible employee information regarding the program, and to report changes in eligibility status to Nationwide.
 
 
 29
 While we find nothing in the formal allocation of responsibilities to conclude that Nationwide possessed the necessary discretionary authority to render it a fiduciary, we must also look beyond the formalities to see if Nationwide in fact exercised authority over these sorts of notifications. See Leigh, 727 F.2d at 134 n. 33. Our review of the record, however, reveals no such voluntary assumption of this function by Nationwide.
 
 
 30
 There simply is no basis in the plan documents or Nationwide's actions to conclude that Nationwide possessed or exercised discretionary authority or responsibility with respect to the notification at issue. We cannot blindside Nationwide by implying the existence of obligations when the only source of such obligations is judicial inventiveness. If an insurer, or any other party, could be held to have discretion over an activity simply because it is not prohibited from performing such activity, breaches of fiduciary duty and the consequent litigation would be omnipresent. The costs of ERISA plans would surely surge as parties sought cover from the inevitable barrage of claims. Unable to locate any legal basis in the statute or plan documents for the duty that Coleman would impose on Nationwide, we cannot conclude that Nationwide was a "fiduciary" as to this particular function of notification or that it breached a fiduciary duty.
 
 B.
 
 31
 Coleman also argues that Nationwide failed to fulfill the notification duties assigned in the statute to the plan administrator. ERISA allocates to the plan administrator the responsibility for providing notice of plan provisions and changes that affect the benefits of all. The plan administrator must provide a detailed summary plan description to all participants, as well as notification of any material modifications that are made to a plan. 29 U.S.C. §§ 1022, 1024(b)(1). Coleman alleges that Nationwide did not provide an adequate summary plan description detailing the cancellation procedures. The district court did not reach that question, however, because it found that "Nationwide was neither the administrator nor the sponsor of the plan," and that "Roofing Concepts filled both of those roles." 748 F.Supp. at 431.
 
 
 32
 The statute unambiguously supports the district court's determination that Roofing Concepts, not Nationwide, was the plan administrator. ERISA provides that if a plan administrator is not designated in the written plan documents, then the plan sponsor is the plan administrator. 29 U.S.C. § 1002(16)(A). The statute further indicates that the plan sponsor is "the employer in the case of an employee benefit plan established or maintained by a single employer." Id. § 1002(16)(B)(i). The written plan in this case did not designate a plan administrator, but it did indicate that Roofing Concepts was the plan sponsor. Thus, by virtue of § 1002(16)(A), Roofing Concepts was the plan administrator, and as such, it bore the primary duty of notification with regard to the plan participants. Id. § 1024(b); see also 29 C.F.R. § 2509.75-8, FR 12-Q (1991) (plan administrator is also a named fiduciary). While it is true that an insurer will usually have administrative responsibilities with respect to the review of claims under the policy, that does not give this court license to ignore the statute's definition of plan administrator and to impose on Nationwide the plan administrator's notification duties. See Moran v. Aetna Life Ins. Co., 872 F.2d 296, 298-300 (9th Cir.1989) (holding that group health insurer who was not plan administrator did not bear reporting and disclosure responsibilities); Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1138-39 & n. 5 (D.C.Cir.1989) (holding that group health insurer was not a plan administrator within the meaning of ERISA and did not have duty to provide summary plan information).[3] We, therefore, conclude that Nationwide was not the plan administrator and consequently could not have breached the administrator's statutory duties.
 
 V.
 
 33
 We thus reverse the judgment of the district court, including its award of attorneys' fees, and remand the case with directions to grant summary judgment for Nationwide and dismiss the complaint. It would be improper--and legally insupportable--to require an insurer to pay on a policy where no ERISA duties were transgressed and on which the premiums were never paid. Coleman's unfortunate situation resulted not from any fault of Nationwide, but from the failure of her husband's employer to fulfill its obligations. In resolving claims under the statute, a court must follow Congress' command for adherence to the provisions of the written plan--lest ERISA become an administrator's nightmare and a litigator's dream.
 
 
 34
 REVERSED.
 
 
 
 [1]
 We also note that Nationwide breached no fiduciary duty by regarding the policy as cancelled according to its own terms. "To adhere to the plan is not a breach of fiduciary duty." Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1080 (4th Cir.1989)
 
 
 [2]
 Coleman also argues that Nationwide breached a fiduciary duty that it owed her when it misrepresented that she had coverage even though it knew that Roofing Concepts was delinquent in the premium payments. We note, however, that the alleged misrepresentations to which Coleman seeks to hold Nationwide were mainly made by Capp Care employees. As noted above, Capp Care's written communication to Coleman explicitly stated that its authorization for hospitalization did not guarantee payment and that it was subject to the insurer's verification of coverage. Coleman's effort to sidestep this disclaimer cannot succeed. This theory of recovery, moreover, seems to us to be little more than a repackaging of the equitable estoppel argument made by Coleman. Even if the theory were valid, however, Coleman must still come to terms with the plain language of the plan. She brings this action under 29 U.S.C. § 1132(a)(3), which provides that courts may award "other appropriate equitable relief." As noted above, Coleman was entitled to no benefits under the contract, and this circuit has indicated that extracontractual damages are generally not available as "other appropriate equitable relief" under § 1132(a)(3). See Powell v. Chesapeake & Potomac Tel. Co. of Va., 780 F.2d 419, 424 (4th Cir.1985); cf. Massachusetts Mutual, 473 U.S. at 144, 105 S.Ct. at 3091 (analysis of similar equitable relief provision in 29 U.S.C. § 1109 indicates that "Congress did not intend that section to authorize any relief except for the plan itself. In short, ... we do not find in [§ 1109] express authority for an award of extracontractual damages to a beneficiary.")
 
 
 [3]
 Nationwide's agreement in the written plan to provide Roofing Concepts with individual certificates to be distributed to each employee eligible for coverage did not constitute an assumption by Nationwide of Roofing Concepts' duty to provide a summary plan description. These certificates were to include an explanation of "the main benefits and requirements" of the policy. ERISA provides a lengthy, detailed list of what must be included in a summary plan description. 29 U.S.C. § 1022(b). An agreement to provide a description of "the main benefits and requirements" cannot be reasonably regarded as the equivalent of the summary plan description, which the statute requires to be far broader in scope and detail. See Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1316 (3d Cir.1991)