**Adele GALLIEN, Individually and as Executrix Under the Last Will and Testament of Paul Gallien, Plaintiff,**

**v.**

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY and Carey Energy Corporation, Individually and as Administrator of the Carey Energy Corporation Group Life and Health Insurance Plan, Defendants.**

**No. 91 Civ. 1734 (SWK).**

United States District Court,
S.D. New York.

April 13, 1994.

---

Levy, Lybeck, Bertele & Jaworski, P.C., Springfield, NJ by Edward A. Bertele, for plaintiff.

Putney, Twombly, Hall & Hirson, New York City by Thomas A. Martin, for defendant Connecticut General Life Ins. Co.

McManimon & Scotland, Newark, NJ by Michael A. Lampert and Steven J. Reed, for defendant Carey Energy Corp.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff Adele Gallien ("Plaintiff") brings this action to recover the face amount of a life insurance policy issued by defendant Connecticut General Life Insurance Company ("Connecticut General") for her deceased husband Paul Gallien ("Gallien"). She also seeks damages against Gallien's former employer, Carey Energy Corporation ("Carey"), for breach of fiduciary duty in connection with the cancellation of the policy.

Presently before the Court is Plaintiff's motion for summary judgment on Count Three of the Complaint against Carey. Connecticut General also moves for summary judgment dismissing the Complaint against it, and for summary judgment on its cross-claims against Carey. For the reasons set forth below, Plaintiff's motion is granted. Connecticut General's motion is granted in part and denied in part.

## BACKGROUND [1]

On September 30, 1986, Connecticut General and Carey entered into a written insurance agreement (the "Plan"), pursuant to which Connecticut General agreed to provide group life insurance, disability and medical benefits to Carey's employees. Carey was designated as Plan Administrator, and agreed to pay premiums for the insurance coverage provided by Connecticut General. The Plan provided, however, that Carey reserved "the right to terminate, suspend or modify the plan in whole or in part at any time." *See* the Group Insurance Plan at 1, annexed to the Gallien Dec. as Exh. "A." Subsequently, on October 31, 1988, Carey executed a letter agreement, dated September 30, 1988, which supplemented and became a part of the Plan (the "Supplemental Plan").

### I. The Plan

Pursuant to the Plan, Carey employees were provided with life insurance equal to two times their annual Basic Earnings, up to a maximum amount of $250,000. Under the Plan, insurance would be terminated: (1) if an employee ceased to be in a class of eligible employees or ceased to qualify for the insurance; (2) on the last day in which an employee made any required contribution for the

---

1. Unless otherwise indicated, the following facts are taken from the parties' Rule 3(g) statements, the Declaration of Adele Gallien, dated July 9, 1993 (the "Gallien Dec."), the Affidavit of Robert Marino, sworn to on May 10, 1993 (the "Marino Aff."), the Declaration of John O'Mahony, undated (the "O'Mahony Dec."), the Complaint, and Connecticut General's Amended Answer With Cross Claim. While the Court notes that Plaintiff's Rule 3(g) Statement was untimely, it finds that her late filing did not prejudice defendant Carey.

insurance; (3) on the date the policy was cancelled; or (4) on the date the employee's active service ended. If an employee aged 60 or older became disabled, however, Connecticut General agreed to extend life insurance coverage until either (1) the employee reached the age of retirement; or (2) Carey discontinued premium payments for that individual.

The Plan provided further that, if an employee's life insurance ceased, he was entitled to convert his group insurance coverage into an individual life policy within 31 days of the date that the group coverage was terminated. If the employee died during the 31-day period, Connecticut General agreed to pay the amount of insurance that could have been converted had the employee exercised his conversion option.

The medical expense insurance policy was funded through a program known as Connecticut General's Cash Management Program (the "Cash Program"). Pursuant to the Cash Program, Carey paid a residual premium on a monthly basis to cover estimated expenses, and authorized Connecticut General to write checks against a bank account for claim payments. Carey was obligated to deposit funds into the bank account upon request, up to a maximum monthly amount, to pay such claims. In addition to this bank account funding, Carey was obligated to pay a supplemental premium on each monthly premium due date.

The Supplemental Plan provided that, upon the Plan's termination, Carey owed Connecticut General

(a) An amount equal to the estimated liability for incurred but unreported claims at the close of the preceding policy year (being $264,454 as of October 1, 1988); PLUS

(b) the unpaid portion, if any, of the Maximum Monthly Payments from October 1,

1988 to the date as of which item (a) is revised.

Carey continued to pay the premiums due under the Plan until July 1989, when it ceased making premium payments for all of its employees. See Deposition of John O'Mahony, taken on January 21, 1993 (the "O'Mahony Dep."), at 53–54, annexed to Connecticut General's Appendix of Exhibits as Exh. "D."[2] Carey did not disclose to any of its employees, including Gallien, that it had stopped paying these premiums. Id. at 56, 88.[3] Subsequently, Connecticut General terminated the Plan, effective October 18, 1989, for nonpayment of premiums.

Connecticut General claims that Carey owes $89,923 in premium payments for the months of July through October 1989. As Carey also failed to fund the bank account for the payment of medical benefit claims from July through October 1989, it owes $94,211 in medical benefits funding. Connecticut General contends further that, pursuant to the Supplemental Plan, Carey owes the sum of $652,820 in supplemental premiums for medical benefit insurance. In December 1989, Carey made a single payment in the sum of $11,961 to Connecticut General for premiums owed.

## II. Gallien's Death Benefits

Gallien was an active employee of Carey until January 19, 1989, when he took temporary disability status. At the time he left the company, Gallien was 60 years old and earning $100,000 per year. On March 6, 1989, Gallien applied for long-term disability benefits, and, commencing on July 21, 1989, he became eligible for them. Connecticut General continued to pay long-term disability benefits to Gallien until he died, on October 25, 1989.

Shortly after Gallien's death, Plaintiff applied for death benefits. The parties dis-

---

**2.** While Carey claims that the question as to whether it has paid premiums for July through October 1989 is an issue of fact, the Court finds this contention to be disingenuous in light of the admission of Carey's insurance manager that the premiums have not been paid. See O'Mahony Dep. at 53–54.

**3.** Carey contends that Plaintiff's declaration, in which she states that Gallien was unaware that Carey had ceased premium payments, see Gallien Dec. at ¶ 6, is inadmissible hearsay. The Court finds that it need not decide this issue, however, as Carey concedes that it did not disclose to its employees the fact that it had discontinued premium payments. See O'Mahony Dep. at 56, 88.

agree as to what occurred next. Plaintiff and Carey claim that Connecticut General's in-house counsel initially informed Plaintiff that she would receive her husband's death benefits. Connecticut General disputes Plaintiff's contention that it indicated that she was entitled to the death benefits. Moreover, Connecticut General indicates that it ultimately disclaimed coverage for the death benefits, on the ground that Gallien's life insurance coverage was terminated from the date that Carey discontinued making premium payments in July 1989. Connecticut General indicates further that, as Gallien never submitted an application to convert his group life insurance to an individual policy, and as his time to do so expired ninety days after termination of coverage, pursuant to N.Y.Ins.Law § 3220, he had no right to death benefits.

### III. The Complaint

On September 27, 1990, Plaintiff commenced this action [4] to recover the face value of the life insurance policy. Count One of the Complaint alleges that Connecticut General is liable under the terms of the Plan for life insurance benefits in the amount of $200,000. Count Two of the Complaint alleges that Connecticut General knowingly and wilfully refused to acknowledge its obligation to provide coverage to Gallien, and acted in bad faith in violation of New York Insurance Law § 3220. The Third Count alleges that Carey breached its fiduciary duty to Gallien under 29 U.S.C. § 1109, by failing to notify him that it was delinquent in paying premiums to Connecticut General. The Fourth Count alleges that Carey breached its duties under 29 U.S.C. § 1161, by failing to provide continuity of health care coverage for Gallien and his dependents. Count Five alleges that Carey failed to notify Gallien that he had the right to obtain continued coverage, and that Carey was obligated to provide such continued coverage.

In its answer, Connecticut General alleges four cross-claims against defendant Carey. For its First and Second Causes of Action,

Connecticut General alleges that Carey received the reasonable value of the insurance and other services provided by Connecticut General under the Plan, and that Carey breached the Plan by failing to pay premiums due in the amount of $1,030,729.90. Connecticut General also seeks contribution and indemnification against Carey (Third and Fourth Causes of Action).

Plaintiff now moves for summary judgment on Count Three of the Complaint against Carey. Connecticut General also moves for summary judgment dismissing the Complaint against it, and for summary judgment on its cross-claims against Carey. The Court will consider each of the parties' motions in turn.

### DISCUSSION

#### I. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York,* 762

---

4. The action was originally instituted in the United States District Court for the District of New Jersey, and subsequently transferred to the

Southern District of New York. *See* Affirmation of Thomas A. Martin ("Martin Aff."), dated May 26, 1993, at ¶ 3.

F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–1609, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The Court is to inquire, however, whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmoving's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States Fire Ins. Co.,* 804 F.2d at 12, 15; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

■ To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. at 330, n. 2, 106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1969)); *see also Weg v. Macchiarola,* 654 F.Supp. 1189, 1191–92 (S.D.N.Y. 1987).

## II. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on Count Three of the Complaint, which alleges that Carey breached its fiduciary duty to Gallien under 29 U.S.C. § 1109, by failing to notify him that Carey had discontinued premium payments under the Plan. In order to find breach of fiduciary duty, the Court must first determine whether Carey owed any fiduciary duties to Gallien under 29 U.S.C. § 1109, and then consider whether Carey breached these fiduciary duties by failing to notify Gallien that it had ceased paying premiums under the Plan.

■ ERISA § 3(21)(A) provides that a person is a fiduciary to the extent he

(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Congress intended this definition to be broadly construed. *Donovan v. Mercer,* 747 F.2d 304, 308 (5th Cir. 1984). Certain positions, such as trustee or plan administrator, inherently require those who hold them to perform fiduciary functions. *Id.* at 309. Accordingly, as Carey was the designated Plan Administrator and named fiduciary for ERISA purposes, the Court finds that Carey exercised enough discretionary authority to be considered a "fiduciary" within the meaning of ERISA. *See Barnes v. Golden Gulf Offshore, Inc.,* Civil Action No. 87–2383, 1991 WL 55824, at *2, 1991 U.S.Dist. LEXIS 4782, at *5 (E.D.La. April 5, 1991).

■ The Court must next determine whether or not a breach occurred. ERISA

§ 404 sets forth the obligations of a fiduciary under ERISA, codifying the common law prudent man standard of care. *See McNeese v. Health Plan Marketing, Inc.*, 647 F.Supp. 981, 985 (N.D.Ala.1986). Section 404 provides that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .

29 U.S.C. § 1104(a)(1)(A) and (B). Plaintiff claims that Carey breached its fiduciary duties by failing to notify Gallien that it had ceased paying the insurance premiums. The Court agrees.

■ It is well established that a fiduciary is obligated to notify insureds, such as Gallien, of the employer's failure to pay premiums as provided by the insurance agreement. *See Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 74 (4th Cir.) (requiring notice to plan participants of changes in a plan's provisions and an opportunity after such notice for the participant to take action), *cert. denied*, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989); *Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592, 599–600 (3d Cir.) (finding that "[a]t a minimum, the fiduciary obligations of a pension fund trustee require that he notify the pensioner of his employer's failure to contribute to the fund as required by the pension agreement."), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *Barnes v. Golden Gulf Offshore, Inc.*, 1991 WL 55824, at *2, 1991 U.S.Dist. LEXIS 4782, at *5 (holding employer liable for failure to give plaintiffs notice of changes in an employee benefits plan); *Pension Benefit Guar. Corp. v. Greene*, 570 F.Supp. 1483, 1499 (W.D.Pa. 1983) (finding breach of fiduciary duty where trustee failed to notify pensioners of delinquent contributions), *aff'd*, 727 F.2d 1100 (3d Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). Without notice that Carey ceased making premium payments, Gallien lost the opportunity to convert the group policy into individual insurance coverage. Accordingly, by failing to inform Gallien of the nonpayment, Carey breached its fiduciary obligations.

■ Carey contends that it did not owe a fiduciary duty to inform its employees of the missed premium payments before the Plan's actual termination on October 18, 1989. The Court notes that employers "wear two hats" when they act as plan administrators, and that "they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1416–17 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). The Court finds, however, that, while Carey's decision to discontinue premium payments may have been a corporate business judgment exempt from the provisions of ERISA, Carey was obligated as a fiduciary to keep its employees advised as to the status of insurance coverage.

■ Carey contends further that it is not liable, as it believed in good faith that Gallien was covered by the Plan until its termination on October 18, 1989. However, while "a plan fiduciary does not violate section 404(a) simply by making an incorrect interpretation of documents governing the plan," *see Pickering v. USX Corp.*, 809 F.Supp. 1501, 1568 (D.Utah 1992), the Plan did not require Carey to notify its employees when it discontinued premium payments. Rather, Carey owed a fiduciary duty to its employees under ERISA to disclose its failure to pay the premiums. Thus, Carey's liability is not based on an incorrect interpretation of the Plan, but on a violation of its ERISA duties as a fiduciary under the Plan.

■ Finally, Carey argues that Plaintiff's motion is premature, as she has not moved for summary judgment against Connecticut General. According to Carey, Plain-

tiff must first show that she cannot recover from the insurer before seeking damages for breach of fiduciary duty against the insured. The Court disagrees. Plaintiff has shown that Connecticut General denied Gallien's death benefits on the ground that Carey ceased paying premiums for Gallien's life insurance coverage in July 1989. Accordingly, the Court finds that Plaintiff has adequately established a causal connection between Carey's breach of fiduciary duty and Plaintiff's damages. Moreover, the Court finds that Plaintiff's cause of action against Carey for breach of fiduciary duty is separate and apart from its claim against Connecticut General for failure to provide benefits. Thus, this case does not present the problem of "double recovery." *See generally Hughes v. Patrolmen's Benevolent Assoc.*, 850 F.2d 876, 882 (2d Cir.1988) (describing the problem of double recovery where alternative causes of action arise out of the same injuries caused by the same conduct), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). Accordingly, Plaintiff's motion for summary judgment against defendant Carey is granted.

### III. Connecticut General's Motion for Summary Judgment

#### A. *Motion to Dismiss the Complaint*

■ Connecticut General moves for summary judgment dismissing the Complaint on the grounds that Gallien's coverage ceased on the date that Carey discontinued premium payments. For the reasons set forth below, Connecticut General's motion is granted.

■ Where the words of an insurance contract "are clear and unambiguous, they must be accorded their plain and ordinary meaning and the policy enforced as written; a court is not free to modify such terms by judicial construction." *Francis v. INA Life Ins. Co.*, 809 F.2d 183, 185 (2d Cir.1987); *In re Ambassador Group, Inc. Litig.*, 738 F.Supp. 57, 62 (E.D.N.Y.1990). Thus, the Court may not rewrite a insurance policy to provide coverage more equitable than that for which the insured contracted. *Cornellier v. American Casualty Co.*, 389 F.2d 641, 644 (2d Cir.1968).

In the case at hand, the Plan clearly states that if an employee is aged 60 or older when he becomes disabled, his life insurance will terminate at the earlier of (a) the date he attains his normal date of retirement; or (b) the date the policyholder stops paying premiums for him. *See* the Group Insurance Plan, at 51, annexed to the Gallien Dec. as Exh. "A." As Gallien was 60 years old when he became disabled, his life insurance coverage terminated on July 1, 1989, the date that Carey discontinued making premium payments. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 57 (4th Cir.) ("Courts are not at liberty to disregard the plain language of a plan in order to demand that insurers provide coverage for which no premium has been—or ever will be—paid."), *amended*, slip op. (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993).

Plaintiff contends, however, that summary judgment should be denied, as the Plan's terms are ambiguous. Specifically, Plaintiff claims that the phrase "the date the policyholder stops paying premiums for you" refers to a date in which Carey chooses to withhold premiums for a specific employee, rather than for all of its employees covered under the group plan. While the Court is mindful that "ambiguit[ies] in the terms of an insurance contract will generally be construed liberally in favor of the insured," *see Francis v. INA Life Ins. Co.*, 809 F.2d at 185, the Court finds that Plaintiff's interpretation is contrary to the express terms of the Plan. Under Plaintiff's interpretation, Connecticut General would be permitted to terminate life insurance coverage for a disabled employee only when Carey discontinued paying premiums for that specific employee, but continued to pay premiums for its remaining employees. If Carey discontinued paying premiums for all of its employees, Connecticut General would be obligated to continue coverage for both active and disabled employees. Such an interpretation would render meaningless the provision that coverage for a disabled employee will terminate on the date that Carey ceases paying premiums for that employee. Thus, the Court does not find any ambiguity in the provision terminating life insurance coverage for disabled employees on the date that premiums are dis-

continued. *See, e.g., Coleman v. Nationwide Life Ins. Co.*, 969 F.2d at 57 (finding that the language of a plan, indicating that coverage terminates automatically for failure to pay premiums, was unambiguous).

▮▮▮▮ Plaintiff contends further that Connecticut General either waived, or is equitably estopped, from denying that Gallien had coverage through October 18, 1989. "[E]quitable estoppel prevents a party from enforcing or asserting rights where its own conduct has induced another to justifiably and detrimentally rely upon the belief that such enforcement would not be sought." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985, 989 (S.D.N.Y.1993). To establish equitable estoppel, Plaintiff must allege: (1) lack of knowledge of the true facts; (2) reliance on the conduct of the party to be estopped; and (3) a prejudicial change in her position. *Id.; Ogden Corp. v. Travelers Indem. Co.*, 740 F.Supp. 963, 967 (S.D.N.Y.1990). "It requires that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." *Cartwright v. Health and Welfare Pension Fund*, 771 F.Supp. 127, 132 (D.Md.1991).

Waiver is defined as "a voluntary and intentional relinquishment of a known and existing right." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 827 F.Supp. at 989. "Waiver differs from estoppel in that it depends on the intent of the party against whom the assertion lies and does not require any showing of reliance by the asserting party." *Id.*

The Court finds that Connecticut General neither waived nor is equitably estopped from denying coverage to Gallien. "Defenses relating to the issue of the coverage and noncoverage are not waivable, and insurance coverage cannot be created by equitable estoppel where no policy of insurance exists." *Taft v. Equitable Life Assurance Soc'y*, 173 A.D.2d 267, 569 N.Y.S.2d 660, 662 (1st Dep't 1991); *Powers Chemco, Inc. v. Federal Ins.*

*Co.*, 122 A.D.2d 203, 504 N.Y.S.2d 738, 739 (2d Dep't 1986) ("It is by now well established that any defenses which relate to the issue of coverage or noncoverage are not waivable, because the courts will not create coverage where none otherwise exists."); *Van Buren v. Employers Ins.*, 98 A.D.2d 774, 469 N.Y.S.2d 488, 490 (2d Dep't 1983) ("Insurance coverage cannot be created by equitable estoppel where no policy of insurance exists."). As Gallien's insurance policy terminated when Carey discontinued premium payments, his insurance coverage cannot be re-created either by equitable estoppel or by waiver.

▮▮▮ Moreover, even if equitable estoppel was an available defense, the Court finds that Plaintiff has failed to establish that Gallien relied on any misrepresentations made by Connecticut General as to the availability of death benefits. Thus, contrary to Plaintiff's contention, neither the fact that Connecticut General delayed terminating the Plan until October 1989, nor the fact that it continued to pay Gallien's disability benefits until his death demonstrates that Connecticut General misrepresented the availability of Gallien's death benefits. Accordingly, as the Court finds that Connecticut General did not waive, and is not equitably estopped from determining that Gallien's coverage ceased as of July 1, 1989, Connecticut General's motion for summary judgment dismissing the Complaint is granted.

### B. *Motion Against Defendant Carey*

Connecticut General also moves for summary judgment on its cross-claims against defendant Carey, seeking to recover "at least $824,993.00 in insurance premiums due to it from Carey Energy as a result of various group insurance policies issued by Connecticut General for the benefit of Carey Energy." *See* Connecticut General's Memorandum of Law, dated May 26, 1993, at 2. Carey does not deny that it failed to pay Connecticut General premiums due under the Plan and Supplemental Plan.[5] Instead, it

---

5. Carey argues that Connecticut General cannot simultaneously seek recovery of insurance premiums for July through October 1989 while denying Gallien life insurance coverage during the same period. The Court finds that, while Connecticut General cannot collect life insurance

disputes the amount due, claiming that Connecticut General cannot explain its own premium computations. Specifically, Carey notes that Connecticut General alleged, in a letter dated April 25, 1990, that Carey owed it $1,151,801.00. *See* letter from Jonathan Hatch, legal counsel to Connecticut General, to John O'Mahony, Carey's insurance manager, of 4/25/90, at 2, annexed to the O'Mahony Dec. as Exh. "A." Subsequently, in its Amended Answer with Cross Claim, dated March 10, 1992, Connecticut General alleged that Carey owed it $1,030,729.90. In connection with this motion, however, Connecticut General seeks "at least" $824,993 in damages.

Accordingly, as Carey does not contest liability, Connecticut General's motion for summary judgment on the issue of liability is granted. The Court will refer this matter to a Magistrate Judge for an inquest to determine the actual amount that Carey owes to Connecticut General.

### CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment, pursuant to Rule 56(c) of the Fed.R.Civ.P., on Count Three of the Complaint against defendant Carey is granted. Connecticut General's motion for summary judgment dismissing the Complaint against it is granted. Furthermore, Connecticut General's motion for summary judgment on its cross-claims against Carey is granted on the issue of liability. This matter shall be referred to a Magistrate Judge for an inquest to determine the amount of damages that Carey owes to Connecticut General. The remaining parties are to appear for a pretrial conference on June 29, 1994, at 10:30 a.m.

SO ORDERED.

---

premiums for Gallien after his coverage terminated on July 1, 1989, Connecticut General may collect premiums for life, medical and disability insurance coverage provided to Carey's other employees during this interval, and for medical and disability benefits provided to Gallien until his death.