JOSEPHINE DIVITA, Respondent, *v.* NEW YORK LIFE INSURANCE COMPANY, Appellant.

Fourth Department, May 8, 1935.

*Roy P. Ohlin [Louis H. Cooke, Franklin D. L. Stowe* and *Mason O. Damon* of counsel], for the appellant.

*George C. Riley;* for the respondent.

TAYLOR, J. This is an appeal from a judgment in favor of the plaintiff entered upon a directed verdict; also from an order denying defendant's motion for a new trial on the minutes. The action was on two policies of life insurance, each in the principal sum of $2,000. The policies bore different dates but each went into effect November 18, 1931. The insured died November 19, 1933. Initially, the policies provided for payment of premiums in the amount of $57.56 semi-annually on the eighteenth of each May and November, thirty-one days' grace being allowed for premium payments. Premiums were duly paid semi-annually until the payment for November, 1932, became due. The controversy commences here. The policies contained this provision: " The premium may be made payable annually, semi-annually, or quarterly in advance at the company's respective rates for such modes of payment and, except as may be otherwise herein provided, the mode of payment may be changed by agreement in writing and not otherwise." Plaintiff alleges and claims to have established that pursuant to an oral arrangement entered into prior to November 18, 1932, between plaintiff and defendant's agent and later ratified by defendant, plaintiff duly made full premium payments by paying quarterly on or before each due date beginning with November 18, 1932. Plaintiff claims that she has adequately proved that defendant delivered to the insured official premium receipts for the premiums due November 18, 1932, February 18, 1933, May 18, 1933, and

August 18, 1933; that for each quarterly payment in the year 1933 the defendant had mailed to the insured the notice required by statute and under the terms of the policy; that at the time of the payment due November 18, 1932, defendant accepted the sum of $29.34 then due as an advance quarterly payment, made no claim of default in such payment, waived any indorsement in writing of change in the method of payment, thereafter gave notice and duly accepted quarterly payments without such indorsement and without making any claim of default or lapse based on any delinquency in the time or method of payment. It appears that after payment of the premium due November 18, 1932, and prior to the expiration of the thirty-one days of grace allowed for such payment, defendant prepared a written application for change of mode of premium payments and — as plaintiff claims — misrepresented to the insured that he must apply for such change in writing and that the same must be approved by the defendant before the quarterly payment due November 18, 1932, could become effective. Plaintiff further contends that the insured, believing and relying on such misrepresentation, signed the application without knowledge of its contents or effect; that defendant afterward claimed a lapse and forfeiture of the policy on the ground that the payment of $29.34, made about November 18, 1932, must be considered to have been made after the grace period had expired; that by means of such false and fraudulent representations defendant induced the insured to apply for reinstatement on December 29, 1932; that insured signed said application for reinstatement without knowledge of the fact that the policy had not lapsed and that the answers caused by defendant to be made by him in said application were untrue. The defendant admits that on or about December 20, 1932, the insured executed and delivered to the defendant a request in writing that the mode of payment of premiums be changed to quarterly payments of $29.34 each; that the request was approved by defendant, and such change was made but was not indorsed upon the policy; that thereafter official premium receipts for premiums payable February 18, 1933, May 18, 1933, and August 18, 1933, were delivered to the insured and that defendant mailed to the insured the notice of each of such quarterly premiums as required by statute and the terms of the policy; that on or about December 29, 1932, defendant took the position that the policy had lapsed for non-payment of the premium due November 18, 1932, and that about December 29, 1932, the insured delivered to defendant an application for reinstatement. After alleging the application for reinstatement on December 29, 1932, the defendant alleges that said application represented that the insured was in the same condition of health as he had been when the policy was issued; that said representation

was untrue; that defendant, believing and relying upon the same, reinstated the policy on or about December 29, 1932; that upon learning of the falsity of said representations it elected to and did cancel the policies and tendered to plaintiff the premiums theretofore paid, which tender was refused. The defendant then admits and alleges that defendant refused to pay the face of the policy or any part thereof because of said misrepresentations made in the application for reinstatement and for other good and sufficient reasons.

At the close of the defendant's case the court granted to the defendant leave to amend its answer as follows: " The policies referred to in the complaint herein, and each of them, were not procured upon the application of Samuel Rinaldo, the person described in the complaint herein, and that no contract of insurance was ever made between the New York Life Insurance Company and Samuel Rinaldo, the person referred to in the complaint herein."

After the proof was in defendant moved for a dismissal of both causes of action so far as they provided for double indemnity. Plaintiff moved for a direction of a verdict on both policies, and also moved for a direction on the double indemnity features. The court granted the defendant's motion. Defendant then moved for a dismissal of the plaintiff's complaint on the ground that it affirmatively appeared that the policies had lapsed, that there were misrepresentations in the application for reinstatement, and that there was substitution on the physical examination for reinstatement and that hence no valid policy of insurance was ever effected. The court denied the motion, ruling as a matter of law that the conduct of the defendant, its agents and officers, was such that there was no lapse and hence no requirement for reinstatement. On the question of substitution the court ruled that the evidence was so meager that a finding of substitution would have to be set aside as against the weight of the evidence, and that even if such substitution were found, it did not go to the existence of the contract, but was a matter of fraud in the making of the contract, as to which the two-year limitation clause applied. The defendant excepted to this ruling. The court then granted plaintiff's motion for a direction of a verdict upon each policy for $2,000 and interest. Defendant did not move to go to the jury on any question of fact, and the plaintiff did not appeal from the order denying recovery on the double indemnity features of the policy.

The contract provides for no time limit within which change of mode of payment must be made. No agreement in writing was ever demanded. The defendant furnished to the insured a printed form which is in terms a request for change. It was furnished prior to December 20, 1932. It bears the approval of the defend-

ant but the approval is undated. The testimony of defendant's agent McLaughlin shows that it was not signed by Rinaldo until December twentieth (one day after the expiration of the grace period) for the sole reason that the defendant demanded that Rinaldo's signature be witnessed by two witnesses and duly acknowledged. The defendant was not entitled to make this demand. The acknowledgment form is not a part of the printed document but was added in typewriting, apparently by the Buffalo office. It would be unconscionable to permit the defendant to interpose a claim of forfeiture for delay based solely upon its own conduct in requiring the performance of acts not essential and not required by the terms of the policy. (*Kenyon* v. *K. T. & M. M. A. Assn.*, 122 N. Y. 247.) Defendant is estopped from claiming that the policy lapsed through failure of the plaintiff to execute a change in the mode of premium payment before December 20, 1932.

This brings us to a consideration of the question whether the quarterly payment due November 18, 1932, was made before the expiration of the grace period, and if not, whether the defendant waived such payment. It was the practice of the defendant to place a card in the mailbox of each of its agents a month before renewal premiums became due, giving notice of the dates of payment in order that each agent might get in touch with his policyholders as to premium payments. John J. McLaughlin, an agent of the defendant, had written the policies. He himself testified that upon receiving the said notice card from defendant respecting the policies in suit he called upon Rinaldo some time before November 18, 1932; that he talked with the plaintiff and she said that she did not think she could pay the premium; it was too much; that McLaughlin had sold her too much insurance anyway. McLaughlin testifies that he then suggested that she pay the premiums quarterly instead of semi-annually and gave her an estimate of how much the payments would amount to; that she said she thought she could do that and that she paid McLaughlin one-half of the semi-annual premiums that day or the next day. McLaughlin estimated the amount of the quarterly premiums by cutting the semi-annual premiums in half. He told plaintiff the payment would amount to a little more than that but he did not have at hand the exact figures; that he would have to have some paper signed changing the financing plan and that he would make the arrangements. McLaughlin went back to the office that day and explained that the plaintiff could not pay semi-annual premiums. He inquired: "What arrangements do I have to make to let her pay quarterly?" They told him they did not know, that they would fix up some papers for him and they finally prepared and delivered to him some papers.

These were received by him prior to the expiration of the grace period. The said papers were printed forms of the defendant, the blank spaces having been filled in by the local branch office. One had been dated in McLaughlin's handwriting December 18, 1932 (which was one day prior to the expiration of the grace period). That date had been stricken out and the document redated December 20, 1932. There was, as I have said, a typewritten (not printed) form of acknowledgment on the back which had been prepared by the local branch office. McLaughlin had much trouble in getting these papers executed to the satisfaction of the company. He made several calls upon Rinaldo, who could not read or write and the company required two witnesses to his signature. The acknowledgments were taken December 20, 1932. McLaughlin could not tell on what day the papers were signed by Rinaldo but knows there was some delay.

When the papers were finally executed, witnessed and acknowledged, McLaughlin turned them in to the branch office. Asked by the court if he turned in the premium payments at the same time, he replied that he could not say whether he turned in the money before he turned in the papers. He then testified that he must have turned in the money before December twentieth " or they would not give me the papers to have executed." When asked as to the amount of the payment, he said he cut the semi-annual premium in half and he had to pay some of it out of his own pocket because more was due than the plaintiff had given to him.

As against this testimony that the quarterly payment was made to the company prior to December 20, 1932, the defendant offered its local office cash book in evidence, which indicates that payment by McLaughlin of one policy was made December twenty-seventh and of the other policy December twenty-ninth. The money was paid to Mr. Vollkle, an employee, and was put on the books " later " by Mr. Ansteth, another employee. The cash book, therefore, indicates, not necessarily the day Vollkle received the payment but the day Ansteth recorded it. There is no evidence as to how much " later " the entries were made, and neither Vollkle nor Ansteth was called to testify as to the fact.

If we are to accept December twenty-seventh and December twenty-ninth as the correct dates when defendant received the premiums, we have still to inquire whether the resulting forfeiture was waived. The assistant cashier of the defendant testified that it was the practice of his company never to pay agents' commission on renewal premiums in cases of lapse until after the policy had been reinstated. He testified that if the policy lapsed the agent could not receive the commission until after it had been reinstated.

He qualified this answer by saying that the commission is paid at the time the premium is tendered to the company " with the proper requirements for reinstatement." When confronted with the fact that the commission was paid December twenty-seventh, but no application for reinstatement was made until December twenty-ninth, he seemed to reverse all of this testimony by saying: " I can see from this now that the net premium was accepted before these requirements were turned in. That is permissible. It is permissible by the clerk who took it in. He can take the net premium minus the commissions and the agent can get these requirements within a reasonable time."

Plaintiff's Exhibit 21 shows beyond a doubt that on December 27, 1932, the defendant paid McLaughlin a commission of four dollars and forty cents upon the renewal premium of one of the policies in suit, due November 18, 1932. December 27, 1932, it will be noted, was after the expiration of the grace period and before any steps had been taken to reinstate the policy. It was paid to McLaughlin at a time when the insured, according to defendant's present claim, was in default.

When the company received this premium payment on December twenty-seventh (assuming as true its contention that it was received on that date) it could deal with it in any one of three ways:

(1) Accept it unconditionally as a due payment of the premium.

(2) Return it to the insured.

(3) Hold it for the insured pending a possible reinstatement o. the policy. (See *Gould* v. *Equitable Life Assurance Society*, 231 N. Y. 208.)

Under option No. 1 the company waives the lapse and under option No. 2 it insists upon it. Under option No. 3 it holds the premium as trustee for the insured, in the meantime waiving none of its rights.

The defendant in the instant case did not return the premium to the insured and it claims it did not accept it as an unconditional payment. It must, therefore, stand upon whatever rights it may have under option No. 3, namely, that it held the payment as trustee for the insured with the right to retain it in case of reinstatement and with the corresponding obligation to return it in case reinstatement was not made. But the trouble with the defendant's position here is that it received the payment without any reservations, and apparently immediately dealt with it as its own property because it paid out the agent's commissions earned on it. Of course this procedure as to payment of agent's commission was a matter between the company and its agent — as to which the insured had no contractual rights. But the company's conduct is to be

considered as bearing upon waiver (or estoppel). The defendant cannot deal with this premium payment as its own property and at the same time claim that it is holding it for the insured.

Did the defendant, by retaining the premium payment and paying commissions thereon, intend to make any claim thereafter that the policy had lapsed? Is it not a more reasonable inference that the company intended to accept and retain the premium as its own property and to waive any forfeiture which may have been incurred? The defendant did not ask to go to the jury on the crucial question of when it received the premium payment due November 18, 1932, and it seems from the foregoing recital that the court as trier of the facts could fairly find (1) either that payment of the premium had been made within the grace period, or (2) that the timely payment thereof had been waived. Courts do not favor forfeitures and are always prompt to seize hold of any circumstances that indicate an election to waive a lapse. (*Kenyon* v. *K. T. & M. M. A. Assn.*, 122 N. Y. 247, 261, quoting from opinion in *Insurance Co.* v. *Eggleston*, 96 U. S. 572, and citing other New York cases.) There was enough to authorize a finding of fact that the original agreement as to time and manner of payments of premiums (1) had been modified by the parties, or (2) that payment of the November 18, 1932, payment exactly when and as the policy provided had been waived. (*DeFrece* v. *Nat. Life Ins. Co.*, 136 N. Y. 144; *Cornell* v. *Travelers' Ins. Co.*, 120 App. Div. 459; affd., 192 N. Y. 587.)

The provision in the policies relating to forfeiture was inserted for the benefit of the insurer, and it had the power to waive it. (*Beil* v. *Supreme Lodge*, 80 App. Div. 609, 612.)

On the issue of substitution the defendant's witness, Dr. Meyers, examined Rinaldo for insurance on May 3, 1931, on behalf of the Prudential Insurance Company. The application for this insurance was dated April 30, 1931, and was made out in the name of Salvatore Rinaldo, No. 154 Trenton avenue, born in Italy July 22, 1881, beneficiary Francesca Rinaldo, his wife, age forty-two, business address 39 East Genesee street, Buffalo, N. Y., employer Buffalo General Electric Company. Defendant's witness, Peter Tomaselli, the agent who brought in this application, reported that he had personally investigated the applicant and recommended the risk. He testified that the wife of the applicant Salvatore Rinaldo was present when he took his application for insurance. He recognized the woman in the court room as the widow of the insured in the instant case.

Dr. Meyers testified that when he examined the man Rinaldo, at No. 154 Trenton avenue, on May 3, 1931, he found that his posture

and carriage were poor, that he walked in a stooped position with the knees slightly flexed. Although the applicant denied suffering from any pains or symptoms, he showed signs of chronic arthritis of the spine and knees and arteriosclerosis. The applicant had a high blood pressure. The arthritis caused him to stoop forward. He was five feet, five inches in height by actual measurement. He was not weighed. Dr. Meyers estimated his weight at 145 pounds. The application of this man for insurance was rejected.

Dr. Kearney testified that according to the defendant's records he examined one Samuel Rinaldo, No. 155 Trenton avenue, November 7, 1931, for defendant life insurance company. The man so examined had no arthritis of the back, no curvature which caused him to lean forward, no hardening or pulsation of the arteries. He was five feet, three inches in height by actual measurement. Dr. Kearney estimated his weight at 165 pounds.

Miriam Bron, an employee of the Charity Organization Society and the Welfare Department, called upon the Rinaldo family at No. 154 Trenton avenue in May, 1933, which was about a year and a half after the Kearney examination, and saw Samuel Rinaldo and his wife, Frances. She testified that Rinaldo was slumped forward, did not stand erect. Asked if she recognized any members of the family in court, she answered that she recognized Frances Rinaldo, the wife of the insured.

Upon this evidence the defendant claims it has established that Dr. Meyers and Miss Bron saw the real Rinaldo and that a man posing as Rinaldo appeared before Dr. Kearney and submitted to a medical examination upon which the policies in suit were issued.

The plaintiff offered testimony to the effect that there are many families named Rinaldo in the city of Buffalo and that it is a common name among the Italians. It appears that the applicant in the instant case was fifty-three years old, not fifty-one; that his wife was forty-seven years old, not forty-two; that the applicant was ill in the spring of 1933, when Miss Bron saw him; that Tomaselli, when asked if he knew the " Prudential " Rinaldo, said that he was not so very familiar with him, but that some one whose name was given to him as Salvatore Rinaldo was present when he took the application; that the " Prudential " Rinaldo spoke English whereas the insured did not; that there is no proof in the record that the insured ever had a business address at 39 East Genesee street or had ever been in the employ of the Buffalo General Electric Company; that plaintiff had no knowledge whatever of the Prudential application; that insured's wife likewise never heard of her husband applying for Prudential insurance and never saw Dr. Meyers prior to the trial; that Mrs. Varco, the insured's landlady, identified Dr. Kearney

in the court room and testified that she saw him coming out of the door of Rinaldo's rooms in November, 1931; that she entered the house as Dr. Kearney was leaving it; that she saw in the house Rose Domenico, also the insured and his wife; that plaintiff was also there at the time and knows that some papers were signed; that Rose Domenico was also there; that insured's wife was there and knows that Dr. Kearney examined her husband at that time and that Dr. Kearney had the insured sign some papers; that Dr. Kearney, who was then in court, was not recalled by the defendant to deny the above testimony of Anna Varco, Rose Domenico, Josephine Divita and Francesca Rinaldo. There was evidence in the case that the insured lived at No. 154 Trenton avenue, but that at the time of Dr. Kearney's two visits in November, 1931, they had moved temporarily, with part of their furniture, to No. 155 Trenton avenue.

This was in substance the evidence offered by the respective parties on the issue of substitution. It was characterized by the court as so meager that a jury verdict of substitution would have to be set aside as against the evidence. Even if this statement was not strictly accurate and the evidence fairly presented a question of fact, there was no motion to go to the jury on this issue; it was left to the court. A further question deserves consideration, i. e., whether the defense of substitution is not barred by the incontestability clause of the policy, which reads as follows: " This policy shall be incontestable after two years from its date of issue except for non-payment of premiums."

This clause bars a defense based upon fraud in the making of the contract. (*Apter* v. *Home Life Ins. Co.*, 266 N. Y. 333.) The appellant contends that in the instant case no valid contract of insurance was ever effected because there was no meeting of the minds of the parties. If such were the fact the contention would find support in the case of *Maslin* v. *Columbian National Life Insurance Co.* (3 Fed. Supp. 368), where it is held that the incontestability clause does not preclude the insurer from contesting liability on the ground that a person other than the insured named in the policies took the physical examination for such policies. Many cases are cited in the opinion holding that where a man, pretending to be someone else, goes in person to another and induces him to make a contract, the resulting contract is with the person actually seen and dealt with, and not with the person whose name was used.

*People* v. *Alexander* (183 App. Div. 868; affd., 225 N. Y. 717) is not helpful to defendant. In that case the insured was the person actually examined, and the person to whom the policy was issued. The fraud was in the making of the contract and as to such fraud

it was held that the incontestability clause applied. However, counsel for the instant defendant did not ask to go to the jury on the question of substitution, but moved generally for a dismissal of the complaint. Any issue of fact as to that question, therefore, was submitted for decision by the court, with defendant's approval, was decided adversely to the defendant — and reasonably so — and the latter cannot now be heard to claim that it had the right to go to the jury on the substitution issue. (*Porges* v. *United States Mortgage & Trust Co.*, 203 N. Y. 181.) That right was waived. (*Bank of State of New York* v. *Southern Nat. Bank*, 170 N. Y. 1; *Adams* v. *Roscoe Lumber Co.*, 159 id. 176; *Glanzer* v. *Shepard*, 233 id. 236; *Hennessey* v. *Knights of Columbus*, 239 App. Div. 409; affd., 264 N. Y. 668.)

The judgment and order should be affirmed.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment and order so far as appealed from affirmed, with costs.