Ed MULDER, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

PCS HEALTH SYSTEMS,
INC., Defendant.

No. CIV.A. 98–1003 (WGB).

United States District Court,
D. New Jersey.

July 17, 2003.

Andrew R. Jacobs, Esq., Epstein, Fitzsimmons, Brown, Gioia, Jacobs & Sprouls, P.C., Chatham Township, NJ, Arthur N. Abbey, Esq., Jill S. Abrams, Esq., Stephanie Amin-Giwner, Abbey Gardy, LLP, New York City, for Plaintiff.

Jeffrey J. Greenbaum, Esq., Sills, Cummis, Radin, Tischman, Epstein & Gross, P.A., Newark, NJ, Paul J. Ondrasik, Jr., Esq., Martin D. Schneiderman, Esq., Linda S. Stein, Esq., Steptoe & Johnson LLP, Washington, D.C., for Defendant.

*OPINION*

BASSLER, District Judge.

This class action litigation concerns alleged breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, by Defendant PCS Health Systems, Inc. ("PCS"). Plaintiff Ed Mulder ("Mulder") moves the Court to certify a plaintiff class consisting of "all PCS beneficiaries covered by ERISA during the period from March 5, 1995 to March 5, 1998 (the 'Class Period')." (Pl. Mem. at 2.) For the reasons set forth below, the Court declines to certify a class as broad as that requested by Mulder, but **grants** certification of a more limited class consisting of all participants, from March 5, 1995 through March 5, 1998, in ERISA-covered employee benefit plans administered by Oxford and for which PCS provided PBM services pursuant to its Commercial Contract with Oxford.

## FACTS AND PROCEDURAL HISTORY [1]

During the class period, PCS provided pharmaceutical benefits management ("PBM") services to benefit providers. These benefit providers included such entities as health insurance companies, health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), Blue Cross and Blue Shield organizations, third-party administrators and self-funded employee benefit plans. During the relevant period, PCS contracted with about 1,250 of these benefit-provider entities, otherwise known as PCS's customers. PCS's customers, in turn, contracted with thousands of employers to administer their employee health benefit plans. According to PCS's own estimate, roughly 56 million individuals received prescription drug benefits during the class period through customers of PCS.

---

1. The following account of the facts accepts the allegations of Mulder's Complaint in so far as a court must not inquire into the merits of a suit in order to determine whether it may proceed as a class action. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Court's inquiry, nonetheless, does "probe behind the pleadings," *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), in order to "thoroughly examine" Mulder's "factual and legal allegations." *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998).

Mulder's personal experiences were as follows. He worked for Scott Printing Company, Inc. ("Scott") in 1997 and 1998 and participated in the employee health plan offered by Scott. Scott contracted with the HMO Oxford Health Plans, Inc. ("Oxford") to provide healthcare coverage to participating Scott employees. Oxford contracted with PCS to provide PBM services. Scott did not contract with PCS directly.

After taking the prescription drug Mevacor, prescribed by his doctor for over a year to lower his cholesterol, Mulder received a notice by mail that PCS was switching his drug to Pravachol. Pravachol was manufactured by a different company and was more expensive than Mevacor. (Compl., ¶ 7.) Mulder alleges that PCS switched his drug to increase its own profits regardless of "cost-saving or medical considerations."[2] (Id., ¶ 8.) PCS allegedly profited by receiving rebates and kickbacks from the drug manufacturers of the drugs promoted by PCS. (Id.)

Oxford had two separate contracts with PCS from 1997 to 1998. One was the Medicare/commercial contract ("Commercial Contract") which applied to commercial plans, like the Scott plan, and to Medicare plans. Oxford's Commercial Contract with the various plans was in effect from March 1, 1997 through December 31, 1998.[3] Approximately 1.35 million participants received prescription drug benefits through this contract. (Def. Opp. at 5; Abrams Decl., Ex. C.) The second contract between Oxford and PCS applied to Medicaid plans ("Medicaid Contract") and governed the drug benefits of about 200,000 Medicaid participants. The Medicaid Contract offered different services than the Commercial Contract. Unlike the Commercial Contract, for instance, the Medicaid contract provided for a "closed" rather than "open" drug "formulary," no manufacturer rebates to Oxford and different service fees. (Def. Opp. at 25; compare Abrams Decl., Exs. A, B and E with Stein Cert., Exs. A and B.)

The Oxford Commercial Contract itself applied to different types of participants. For instance, 950,000 of the 1.35 million participants were "Point of Sale" members and 150,000 were "Medicare Risk" members. (Def. Opp. at 25–26; Abrams Decl., Ex. C.) PCS asserts that "to the extent that [these members] did not receive their health benefits through [an employee health benefit] plan, ERISA does not apply to them....". (Def. Opp. at 26.) Only 250,000 beneficiaries of the Commercial Contract were, like Mulder, HMO members participating in an employee health benefit plan. (Id.; Abrams Decl., Ex. C.)

Mulder filed his Complaint on March 6, 1998. Mulder brings the action pursuant to the ERISA section empowering a plan beneficiary or participant to bring a civil action to recover benefits due or to enforce rights under an ERISA-governed plan. 29 U.S.C. § 1132. (Compl., ¶ 52.) The Complaint seeks relief for PCS's alleged breach of its fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D), and 1106(a) and (b).[4] (Compl., ¶¶ 49–52.)

---

**2.** PCS correctly notes that Mulder has not alleged (and in PCS's opinion could not allege) that (1) the change to Pravachol resulted in any increased cost to Mulder, or (2) Pravachol is any less therapeutically effective than Mevacor. (Def. Opp. at 6; see Stein Cert., Ex. 10, Mulder's Responses 7–9 to PCS's First and Second Set of Interrogatories.)

**3.** Although the proposed Class Period spans from March 5, 1995 through March 5, 1998, PCS has not submitted copies of the Oxford Commercial Contract in effect before March 1, 1997. PCS nevertheless does not argue that the terms of earlier Oxford Commercial Contracts were materially different from the one in effect from March 1, 1997 through December 31, 1998.

**4.** Section 1104(a)(1) requires a fiduciary: to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ... and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

Section 1106(a) prohibits a fiduciary with respect to a plan from causing the plan to engage in certain transactions affecting plan assets. Section 1106(b) prohibits a fiduciary with re-

The Complaint alleges that PCS breached the fiduciary duties that it owed to its beneficiaries under ERISA in three ways: (1) PCS entered into contracts with employee benefit plans, HMOs and insurance companies, which contracts secured illegal windfall profits for PCS; (2) PCS implemented programs to influence pharmacists and physicians to switch the drugs of plan participants; and (3) PCS utilized a method of determining formulary and preferred drugs that did not serve the best interests of plan participants. (Pl. Br. at 2.) All of these actions allegedly violated PCS's fiduciary obligations because the actions enriched PCS at the expense of the "interests" of plan participants and the HMOs and insurance companies "representing" the plan participants. (Compl., ¶ 1(b) and (c).)

The Complaint seeks a judgment declaring certain of PCS's practices to be unlawful; enjoining PCS from continuing those practices; granting equitable relief including an accounting of all illegally-obtained profits and a constructive trust, established on behalf of all affected employee benefit plans, to which PCS must disgorge illegal profits; awarding class members costs and attorneys fees; and creating an appropriate claims resolution facility for the resolution of any remaining individual issues. (*Id.*, ¶ 52.)[5]

## ANALYSIS

■ As noted above, on a motion for class certification, courts must not inquire into the merits of a suit. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Courts may nevertheless "probe behind the pleadings," *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), in order to "thoroughly examine" the plaintiff's "factual and legal allegations." *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir. 1998).

■ Mulder bears the burden of showing that he can adequately represent the asserted class. *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974). In order to do so, Mulder must satisfy the requirements of Federal Rule of Civil Procedure 23.

## I. Federal Rule of Civil Procedure 23

Before obtaining certification, a class must meet the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R.Civ.P. 23(a); *In re LifeUSA Holding, Inc.,* 242 F.3d 136, 143 (3d Cir.2001). If Mulder satisfies these Rule 23(a) requirements, he must then show that the class is appropriate under Rule 23(b)(1), (2) or (3). Fed.R.Civ.P. 23(b). Mulder seeks certification under 23(b)(2) and/or (b)(3).[6]

PCS contends that Mulder has not satisfied the Rule 23(a) requirements of numerosity, commonality or typicality, but does not dispute adequacy of representation. PCS also asserts that Mulder has failed to establish the appropriateness of certification under either Rule 23(b)(2)(injunctive relief applicable with respect to class as a whole) or Rule

---

spect to a plan from engaging in certain self-dealing transactions involving or affecting plan assets.

5. In a previous Opinion filed August 31, 1999, the Court dismissed Mulder's claims alleging unlawful acts favoring PCS's parent company. Slip Op. at 20. The Court also dismissed the claims "concerning" Mulder's request that the Court (1) remove PCS as a fiduciary, (2) enjoin PCS from serving as a fiduciary to any employee welfare benefit plan in the future and (3) install an interim successor fiduciary and/or interim receiver, independent from PCS, to assume PCS's PBM duties until the affected employee benefit plans could enter into alternative PBM contracts. *Id.; see* Compl., ¶ 52(D)(4) and (5). The Court dismissed the claims as far as they requested the three elements of relief listed above because the

Court concluded that such relief "would severely impact the Oxford–PCS relationship" and that Mulder had therefore failed to join Oxford as an indispensable party under Fed.R.Civ.P. 19(a).

6. In the initial set of briefs in support of Mulder's motion for class certification, Mulder only sought certification under subsection (3) of Rule 23(b). Following a hearing before the Court on February 3, 2003, the Court requested additional briefing on various issues and granted Mulder the opportunity to brief for the first time the argument that class certification was appropriate under Rule 23(b)(2) as well as (b)(3). PCS likewise submitted a supplemental opposition brief on the various issues, including certification under (b)(2).

**312**

23(b)(3)(common questions predominate and class action superior for fair adjudication).

### A. Rule 23(a)(1) Numerosity

■ A class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Mulder seeks to represent a nationwide class of about 56 million "participants and beneficiaries of [PCS's] customer plans." (Pl. Br. at 1.) In the alternative, Mulder asserts:

> Even if this Court were to decide that the appropriate class would consist only of members of the Oxford Health Plans (with which plaintiff disagrees), the requirements of Fed.R.Civ.P. 23 would be satisfied. Numerosity would be satisfied because Oxford alone has 1.6 million members.

(Pl. Br. at 15.) The Court interprets Mulder's reference to "Oxford Health Plans" to refer to those employee benefit plans administered or insured by Oxford. According to PCS, Mulder could not assert his claims on behalf of all 1.6 million Oxford participants because only 250,000 individuals received their benefits through employer plans both governed by ERISA and for which Oxford served as administrator (HMO). (*See* Def. Opp. at 25–26.) Even if the class consisted of only 250,000 individuals, however, numerosity would be satisfied. As discussed in more detail below, PCS offers no argument as to why, under Rule 23, Mulder could not represent a class of the 250,000 Oxford–HMO participants of ERISA-covered plans. The Court therefore finds that the proposed class satisfies numerosity.

### B. Rule 23(a)(2) Commonality

■ Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). A plaintiff can meet the commonality requirement by showing "the presence of a single common issue." *In re Prudential Insurance Co. of America Sales Practices Litigation,* 962 F.Supp. 450, 510 (D.N.J.1997) (citing 1 *Newberg* § 3.10, at 3–50 to 3–52).

Mulder asserts that PCS's alleged "common course of conduct" raises the following five common issues: [7]

(1) Is PCS is a fiduciary under ERISA?

(2) Has PCS has breached its fiduciary obligations under ERISA by failing to act with undivided loyalty and solely in the interest of employee benefit plan beneficiaries, and by profiting at the expense of its beneficiaries?

(3) Does PCS's method of determining formulary and preferred drugs violate PCS's fiduciary obligations?

(4) Do PCS's programs to influence pharmacists and physicians to switch policyholders' drugs violate PCS's fiduciary obligations?

(5) Do PCS's contracts with employee benefit plans, HMOs and insurance companies violate PCS's fiduciary obligations.

(Pl. Br. at 15–16.) Mulder argues that:

> proof of these issues, which focus on PCS's single, ongoing common course of conduct, will not vary appreciably from one Class member to another and will advance the claims of all Class members.... Although members of the Class engaged PCS's services under varying circumstances, PCS still owed them fiduciary duties under ERISA and [PCS's] actions ... affected all Class members in a similar manner.

(*Id.* at 16, 20–21.)

### 1. The Threshold Question of Whether PCS Is a Fiduciary Under ERISA

■ Mulder contends that whether PCS is a fiduciary under ERISA presents a question of law common to the proposed class. According to Mulder, PCS engaged in essentially the same conduct in negotiating with drug manufacturers on behalf of the various plans for which PCS provided services:

> PCS does not deny that it alone negotiates with the drug manufacturers and that it has an obligation to base the selection of formulary drugs on the interests of its plans and their beneficiaries.

(Pl. Repl. Br. at 4.) Mulder contends that this common conduct and position of influence

---

**7.** The Complaint also identifies other purportedly common issues. (Compl., ¶ 14.)

with respect to every ERISA plan for which PCS provided services renders PCS an ERISA fiduciary with respect to all of the proposed class members. Mulder alleges that despite PCS's fiduciary status, in all of PCS's negotiations with drug manufacturers, PCS attempted "to obtain the best deal for itself," rather than serving "the best interests" of the beneficiaries of the various ERISA-governed plans. (*Id.* at 5.) Thus, another purported common issue is "whether PCS acted in its [own] best interests and contrary to the best interests of [Mulder] and the [proposed] class." (*Id.* at 7.) This issue assumes PCS's fiduciary status with respect to the entire proposed class.

PCS asserts that the question of whether PCS is a fiduciary under ERISA cannot be resolved in the abstract, without regard to the specific services PCS provided to various employee health benefit plans, their administrators and their beneficiaries. For instance, Oxford's control, relative to that of PCS, over the prescription drug programs challenged by Mulder would affect whether PCS was deemed a fiduciary with respect to those programs. PCS exercised varying degrees of discretion with respect to the health plans administered or insured by different entities. PCS's level of control over any particular employee health benefit plan also depended on the different contractual arrangements between the plan and the administrator, insurer or HMO managing the plan. (*See* D. Br. at 14–15.)

■ To prove a claim of breach of fiduciary duty, Mulder must first establish PCS's fiduciary status. *See In re Unisys Corp. Retiree Medical Benefit ERISA Litig.*, 57 F.3d 1255, 1265 (3d Cir.1995); *Bunnion v. Consolidated Rail Corp.*, 108 F.Supp.2d 403, 412 (E.D.Pa.1999).[8] ERISA defines a fiduciary as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of

its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). This section defines, and sections 1104(a)(1) and 1106(a) and (b) discuss, an ERISA fiduciary as a fiduciary "with respect to a plan." PCS is therefore correct in contending that "ERISA does not regulate fiduciaries at large," but only "with respect to" a particular "plan." (D. Br. at 13.)

■ The fiduciary status of PCS accordingly turns on PCS's actual control and authority over a particular plan. *See Mertens v. Hewitt Associates*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)(stating that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional terms* of control and authority over the plan"). In *Pegram v. Herdrich*, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), the Supreme Court further explored the concept of fiduciary status under ERISA:

A fiduciary within the meaning of ERISA must·be someone acting in capacity of manager, administrator, or financial adviser to a "plan" ... In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Id.* at 222 and 226, 120 S.Ct. 2143. Even if an entity is an ERISA fiduciary for some purposes, therefore, not every action the entity takes must benefit plan beneficiaries. *Id.* at 225, 120 S.Ct. 2143.

■ The *Pegram* analysis bears directly on the question of whether PCS's fiduciary

---

8. The other three elements of an ERISA fiduciary breach claim require that the fiduciary (1) made material misrepresentations which (2) the fidu-

ciary knew caused confusion among beneficiaries and which (3) resulted in harm to plaintiffs. *Id.*

status presents a common question in this case. Mulder contends that "the services that PCS provide[d] for [Mulder] and the other [proposed] Class members, as employee welfare benefit plan participants and beneficiaries, renders PCS a 'fiduciary' under ERISA." (Pl. Br. at 2.) The problem with Mulder's assertion is that, even if PCS negotiated with drug manufacturers with respect to every plan it serviced, PCS's "services" differed markedly from plan to plan. Under *Pegram,* a court must look to the precise services provided and actions taken by PCS, rather than to its general "structure, untethered to claims of concrete harm." 530 U.S. at 234, 120 S.Ct. 2143.

Mulder alleges that PCS's actions concretely harmed the entire proposed class because PCS (1) failed, "pursuant to the terms of its contracts with all of its customers, to pass on all rebates and discounts it receive[d]" from drug manufacturers; (2) received "improper payments" from drug manufacturers; (3) never revealed to its customers the total sums it received from drug manufacturers; (4) promoted, by means various "preferred drug lists" applicable to certain plans, products of drug manufacturers that paid PCS rebates and kickbacks; and (5) induced, through various programs, pharmacists and physicians to switch plan beneficiaries' prescribed drugs to those of manufacturers paying PCS rebates or kickbacks or to prescribe the favored drugs in the first instance. (Pl. Br. at 4–12.)

A review of the terms of PCS's contracts with several customers, however, reveals that, contrary to Mulder's assertion, the contracts are not "essentially standard form contracts." (Pl. Repl. Br. at 6.). Whereas Mulder contends that each contract required

PCS to "pass on [to its customers] all rebates" that PCS received from drug manufacturers, (*Id.*), according to PCS:

> The percentage of the rebate provided to the customer was a negotiated issue in each customer contract and the amount of the rebate so provided differed from contract to contract. A few customers, like Oxford Commercial (Ex. D. to Abrams Dec.), received **100% of the rebates.** Some customers received a smaller percentage of the rebates (*see, e.g.* Ex. E and F to Abrams Dec. where customer received **50 percent of rebate[s]**), and some customers received **none of the rebates** (*see, e.g.* Contract E53, Ex. 8 to Stein Cert.). Customers who received 100 percent of the rebate do not have this issue in common with customers who received none of the rebate.

(Def. Br. at 16)(emphasis added).[9]

The contracts produced by PCS make clear that PCS was not contractually bound to pass along to all of its customers all of the "rebates" PCS received from drug manufacturers. Each contract defines "rebates" as follows:

> "Rebates" shall mean, for any period, all rebates, reimbursements or other discounts received under a Manufacturer's discount program with respect to pharmaceutical products dispensed to a Member under the Plan during such period.

(Abrams Declaration, Exs. D, E and F at PCS–MU1157, PCS–MU24896 and PCS–MU24921 respectively.)[10] The Oxford contract provided that PCS must pay to Oxford 100 percent of the rebates PCS received from drug manufacturers. (Abrams Declaration, Ex. D at PCS–MU1169.) By contrast, another PCS-customer contract provided:

**9.** The exhibits referred to, contained within the Abrams Declaration in Support of Class Certification, are copies of contracts between PCS and four different customers, including Oxford.

**10.** One contract, contained within the Stein Certification in Opposition to Class Certification, adds the following to the definition of "rebates": "Rebate" shall not include any fee or other compensation paid by a Manufacturer to PCS for its own account, including without limitation administrative fees not exceeding three percent of the cost of the pharmaceutical prod-

ucts dispensed to Members, or fees for services rendered or property provided to a Manufacturer (to extent permitted by this Agreement and applicable law). Such payments will be retained by PCS. Annually PCS will provide Customer with a report specifying the administrative fees received from each Manufacturer with respect to pharmaceutical products dispensed to a Member under the Plan during the applicable period.

(Stein Certification, Ex. 8 at PCS–MU 25090.)

As consideration for the Formulary,[11] the negotiation, collection and distribution of Rebates and other Services provided by PCS under this Agreement, Customer shall pay to PCS a fee [of 50 percent] multiplied by the Rebates collected by PCS in connection with this Agreement. In lieu of billing Customer for the fees provided for in this section, PCS may retain those amounts from any Rebates collected by PCS on behalf of Customer in connection with this Agreement.

(Abrams Declaration, Ex. E at PCS–MU 24896 and 24898.) According to this customer contract, therefore, as payment for its formulary service, PCS retained 50 percent of the rebates. Yet a third contract provided that the customer would pay to PCS, as consideration for PCS's services, "an amount equal to 100 % of the Rebates." (Stein Certification, Ex. 8 at PCS–MU 25092.) In other words, this customer was not contractually entitled to retain any of the rebates PCS received from drug manufacturers. Mulder therefore is incorrect that PCS was bound in each of its contracts with customers by an identical contractual "provision" requiring PCS to pass on all rebates to customers. (*See* Pl. Repl. Br. at 7.) Even assuming PCS's fiduciary status, therefore, PCS's alleged violation of this purported provision could not present an issue common to the proposed class.

Not only did the fees charged and services performed by PCS vary by contract, but so did the relative control by PCS's customers over many of the programs challenged by Mulder. Different customers elected different services and agreed to pay different fees for different guarantees. (Def. Br. at 9.) Oxford, for instance, exerted a unique degree of control over the pharmaceutical benefits services provided by PCS because, unlike some customers, Oxford developed its own Performance Drug List and pharmacy network, and "retained control over the physician interventions in the retrospective drug utilization review and academic detailing services." (*Id.* at 15; Abrams Declaration, Ex. A at PCS–MU 1162 (¶ 1(D)), 1165 (¶¶ 4(B) and (C)), 1168 (¶ 10(A)), 1169 (¶ 11), and 1174–1183 (Exs. C, D and E).)

Whether a customer participated in the various programs challenged by Mulder, and each customer's relative control over the programs, would affect whether PCS was acting as an ERISA fiduciary with respect to those activities and with respect to each plan. *See Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990)("[f]iduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions"). In *Coleman v. Nationwide Life Insurance Company*, 969 F.2d 54, 61 (4th Cir.1992) the court explained that "a court must ask whether a person is a fiduciary [under ERISA] with respect to the particular activity at issue." It added that "[t]he discretionary authority or responsibility which is pivotal to the statutory definition of 'fiduciary' is allocated by the plan documents themselves." *Id.* Beyond the plan documents, the court must also determine if an entity "in fact exercised authority" that would render the entity a fiduciary with respect to certain actions. *Id.*

Mulder is correct that "commonality can be satisfied despite class members' participation in numerous plans." (Pl. Repl. Br. at 4.) *See Fallick v. Nationwide Mutual Insurance Company*, 162 F.3d 410, 422 (6th Cir.1998)(beneficiaries of different ERISA-regulated health insurance plans, all administered or insured by a single entity, could pursue class action claiming beneficiaries were improperly denied reimbursement for health care benefits); *see also Forbush v. J.C. Penney Company, Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993)(reversing lower court's denial of class certification where plaintiff sought to represent members of four different ERISA-governed pension plans, all administered by one employer, because plaintiff "framed her challenge in terms of [the em-

---

11. A "formulary" is a list of drugs, often published with clinical and comparative cost information. (Def. Br. at 3; Rus Cert., ¶ 2.) The formulary service referred to in the contracts entailed PCS working with the customer (HMO or plan administrator) "to effect the adoption, distribu-tion and implementation of a drug formulary based on the PCS formulary." (Abrams Declaration, Ex. E at PCS–MU24895.) A customer choosing to adopt PCS's standard formulary paid an agreed-upon fee. (*Id.*)

ployer's] general practice of overestimating social security benefits" in violation of ERISA's nonforfeiture provisions); *Caranci v. Blue Cross & Blue Shield of Rhode Island,* 194 F.R.D. 27, 39 (D.R.I.2000)(certifying class of individuals participating in different ERISA plans all administered by defendant); and *Sutton v. Medical Service Association of Pennsylvania,* 1993 WL 273429, *5 (E.D.Pa. July 20, 1993)(certifying class of members of different ERISA-protected plans insured jointly by two entities where common issue was whether defendants "violated their duties as fiduciaries under ERISA through the formulation and implementation of the claims procedure which they ... admitted they ... applied uniformly to the claims of the members of the class").

Unlike the cases cited by Mulder involving multiple ERISA plans, however, Mulder's proposed class includes beneficiaries of plans managed by approximately 1,250 different plan administrators. PCS had separate contracts with each of these plan administrators, which, in turn, had contracts with thousands of employers. These employers employed the millions of individual employees composing the proposed class of ERISA plan beneficiaries. This is therefore not a case simply involving multiple employer-employee ERISA plans.

Mulder contends that PCS's fiduciary status does not depend on its separate contracts with the 1,250 plan administrators. First, "PCS admits that its contracts with *drug manufacturers* are not specific to a PCS client." (Pl. Repl. Br. at 4, citing Abrams Declaration, Ex. G, Response No. 7 (emphasis added).) Furthermore:

> [T]he allegation is that PCS used its influence and always negotiated with manufacturers for every contract and every plan. Therefore, since PCS'[s] conduct as to each plan was identical, the fact that there are different provisions in different plans does not undermine [PCS's] common conduct. Further, nothing in any of the plans would relieve PCS of its fiduciary status.

(Pl. Suppl. Br. at 12–13.) Mulder nonetheless cannot contest that significant variations exist between the provisions of the different contracts entered into between PCS and the ERISA plan administrators that were its customers. These provisions made different guarantees to plan beneficiaries (such as the percentage of rebates to be paid to the plan rather than retained by PCS) and therefore set forth distinct obligations on the part of PCS.

In addition, even if, as Mulder asserts, PCS's "conduct" was the same with respect to each ERISA plan, the alleged identical conduct amounts to a legal conclusion by Mulder that in every instance in which PCS negotiated with drug manufacturers, PCS's actions violated its ERISA fiduciary obligations. Mulder cannot dispute that different plan administrators, such as Oxford which administered the Scott plan in which Mulder participated, paid for different services to be performed by PCS. PCS also negotiated with drug companies for different services pursuant to PCS's different types of contracts with plan administrators. The specific programs for which PCS negotiated with drug manufacturers are relevant to determining PCS's fiduciary status. Oxford, for instance, retained greater control than other plan administrators over the programs challenged by Mulder, such as Oxford's preferred drug list, its pharmacy network, and its physician interventions in the so-called "retrospective drug utilization review" and "academic detailing." (D. Br. at 15.) Consequently, PCS might turn out to qualify as a fiduciary with respect to plans serviced by Oxford, but not with respect to plans serviced by different customers of PCS.

The Court therefore concludes that whether PCS is a fiduciary under ERISA does not present an issue common to the proposed class. All of the other purportedly common issues identified by Mulder turn on the threshold question of whether PCS acted as an ERISA fiduciary with respect to the particular activities challenged by Mulder. Thus the proposed class fails to meet the commonality requirement of Rule 23(a)(2) because Mulder has failed to establish a single issue common to the proposed class.

The Court nevertheless finds that Mulder has asserted common issues with respect to a more limited class consisting of participants in ERISA governed plans ad-

ministered by Oxford and for which PCS provided PBM services pursuant to its Commercial Contract with Oxford. The Court will be able to determine whether PCS acted as an ERISA fiduciary based both on the terms of the Commercial Contract and on PCS's conduct pursuant to those terms. If Mulder establishes PCS's fiduciary status with respect to the plans administered by Oxford under the Commercial Contract, then Mulder can further attempt to establish the alleged breach of PCS's fiduciary duties on a class-wide basis, focusing on PCS's participation in the specific programs implemented under the Commercial Contract.

### C. Mulder Has Standing to Assert His Claims

█ PCS contends that Mulder does not have standing to assert claims on behalf of employee benefit plans other than his own. (*See* Def. Suppl. Br. at 3–10.) PCS acknowledges that:

> there do not appear to be any ERISA class action cases that expressly address ... whether a plaintiff can represent plans in which he is not a participant in an action that involves only derivative claims under ERISA § 502(a)(2).

(*Id.* at 7–8.) PCS argues that "in the analogous shareholder derivative context," courts have required the plaintiff to be "connected" to the entities on whose behalf plaintiff is suing. (*Id.* at 8.) According to PCS, therefore, the Court should not certify a class broader than that of participants in Mulder's employee benefit plan (the Scott Printing plan).

PCS correctly notes that an individual can bring an ERISA civil action under 29 U.S.C. § 1132(a)(1) or (2). Subsection (1) allows the plaintiff:

> to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1). PCS refers to an action under this subsection as a "personal" action under ERISA. (Def. Suppl. Br. at 3.) Under subsection (2), an individual can also bring an action as a plan participant for relief

under § 1109 for a breach of fiduciary duty. PCS refers to an action under subsection (2) as "derivative" (*Id.*) because § 1109 requires a fiduciary who has breached its duties under ERISA "to make good to [the] plan any losses to the plan resulting from [the fiduciary's] breach." 29 U.S.C. § 1109(a). Mulder's action falls under subsection (2), in that he is requesting relief on behalf of his plan for losses sustained by his plan.

In *Fallick v. Nationwide Mutual Insurance Company,* 162 F.3d 410 (6th Cir.1998), the court did not adopt the view propounded by PCS that "derivative" suits under ERISA were analogous to shareholder derivative actions. In fact, even though the plaintiff in *Fallick* brought suit under both § 1132(a)(1) and (2), the court noted:

> apposite decisions ... hold that an individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans.

*Id.* at 422. A class representative such as Mulder, therefore, can represent absent class members, even those suing "derivatively" under § 1132(2), as long as he satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. *Id.* The Court concludes that Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class.

### D. Rule 23(a)(3) Typicality

█ Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The court must ask:

> whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented.

*Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994).

█ For the same reasons discussed above regarding commonality, the Court

finds that Mulder has failed to establish typicality for his proposed class. Mulder is simply incorrect in asserting that PCS's roughly 1,250 contracts with ERISA plan administrators "are essentially standard form contracts" and that, pursuant to them, "PCS is obligated to pass on all rebates and discounts it receives." (Pl. Repl. Br. at 7.) Certainly, the amount of rebates PCS was entitled to retain (in some cases 50 percent) bears on the question of whether PCS received "windfall financial benefits." (*Id.*) In addition, the alleged illegal "course of conduct," (*Id.*), was not identical with respect to the different employee benefit plans because different plan administrators (1) paid PCS to perform different services and (2) exerted various levels of control in participating in the PBM-related programs.

As a result, Mulder's claims are only typical of plan participants who received PBM services through an ERISA-governed plan serviced by Oxford under its Commercial Contract with PCS.

### E. Rule 23(a)(4) Fair and Adequate Representation

 Rule 23(a)(4) requires a representative plaintiff to show that he "will fairly and adequately protect the interests of the class." The rule is "designed to ensure that the absent class members' interests are fully pursued." *Samuel–Bassett v. Kia Motors America, Inc.*, 212 F.R.D. 271, 279 (E.D.Pa.2002)(citing *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 312 (3d Cir.1998)). The court must find that the representative plaintiff's counsel is qualified. *See Barnes v. American Tobacco*, 161 F.3d 127, 141 (3d Cir.1998). The named parties must also be free from conflicts of interest with the class they seek to represent. *Amchem Products v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The *Samuel–Bassett* court summarized the inquiry as follows:

> In short, the plaintiffs' attorney must be qualified, experienced and generally able to conduct the proposed litigation, and the plaintiffs must not have interests antagonistic to those of the class. It is the

defendants' burden to show the inadequacy of plaintiff's class representation.

212 F.R.D. at 279 (internal citations omitted).

PCS has not raised any objections to class certification based upon adequacy of representation. The Court has no basis to believe that Mulder has any conflicts of interests with other members of the more narrow class to be certified. The Court furthermore finds plaintiff's co-counsel, Epstein, Fitzsimmons, Brown, Gioia, Jacobs & Sprouls, P.C. and Abbey Gardy, LLP, to be qualified and able to prosecute this litigation on behalf of the class.

### F. Certification Under Rule 23(b)(2) If Final Injunctive Relief Appropriate with Respect to Class as a Whole

 Under Rule 23(b)(2), provided a plaintiff has satisfied all four requirements of Rule 23(a):

> [a]n action may be maintained as a class action if ... the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). To succeed in certifying a class under (b)(2), a plaintiff must seek:

> primarily injunctive or corresponding declaratory relief. ... The (b)(2) class serves most frequently as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment.

*Barnes v. The American Tobacco Company*, 161 F.3d 127, 142 (3d Cir.1998)(internal quotations and citations omitted). Class members certified under this subsection have no absolute right to notice or to opt-out of the class. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir.1998). The court must ensure that a class certified under (b)(2) is cohesive:

> because it would be unjust to bind absent class members to a negative decision where the class representative's claims

present different individual issues than the claims of the absent members present.

*Id.* at 143.

While the Third Circuit has not confronted the issue, the Fifth Circuit has addressed when a class action is seeking primarily injunctive relief as required by (b)(2):

> [M]onetary relief "predominates" under Rule 23(b)(2) when its presence in the litigation suggests that the procedural safeguards of notice and opt-out are necessary, that is, when the monetary relief being sought is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case.... Because it automatically provides the right of notice and opt-out to individuals who do not want their monetary claims decided in a class action, Rule 23(b)*(3)* is the appropriate means of class certification when monetary relief is the predominant *form of* relief sought .... [M]onetary relief predominates ... unless it is incidental to requested injunctive or declaratory relief.

*Allison,* 151 F.3d at 415 (emphasis added). By "incidental" damages, the *Allison* court meant damages that (1) "flow directly from liability to the class *as a whole* on the claims forming the basis for the injunctive or declaratory relief;" (2) are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances;" (3) "should not require additional hearings to resolve the disparate merits of each individual's case," nor "*introduce new and substantial legal or factual issues*" entailing "complex individualized determinations;" and (4) "will, by definition, be more in the nature of a group remedy." *Id.*

PCS argues that "[t]he essence of Mulder's requested relief is monetary" because Mulder has conceded that damages would consist of the allegedly illegal profits PCS obtained from its deals with drug manufacturers. Mulder's counsel has explained their aim that this money would be "put into a pot ... and drawn down by the individual [employee welfare benefit] plans." (Def. Suppl. Br. at 14, quoting Mulder's counsel at February 3, 2003

hearing, Tr. at 15.) The fact that Mulder seeks disgorgement of illegal profits, however, does not mean that his request for relief is predominantly monetary.

■ Examining the Complaint, the Court finds that the requested damages are incidental to the injunctive relief sought. Mulder demands a judgment (1) declaring PCS's practices unlawful; (2) enjoining PCS from continuing the practices; (3) granting equitable relief including (a) an accounting of all illegal profits, (b) establishing a constructive trust on behalf of all affected employee benefit plans, and (c) ordering PCS to disgorge all illegal profits into a constructive trust to be "distributed appropriately to the affected employee benefit plans;" (4) awarding Mulder and other class members their litigation costs and reasonable attorneys' fees; and (5) "[c]reating an appropriate claims resolution facility for the resolution of individual issues, if any, remaining after resolution of class issues." (Compl., ¶ 52.) The monetary relief requested meets the *Allison* court's definition of incidental damages.

First, the illegal profits sought would flow from liability to the class as a whole on the claims—that PCS breached its ERISA fiduciary duties—forming the basis for the requested injunctive and declaratory relief. If the Court determined that PCS had obtained illegal profits from practices that breached its fiduciary duties to plans and plan beneficiaries, then those illegal profits would be disgorged to a constructive trust to be distributed to the affected employee benefit *plans* themselves, rather than to individual plan beneficiaries. Such damages would be computable by objective standards, would not require individualized hearings, and would be a quintessential "group remedy."

Even though the Complaint does request creation of a claims resolution facility to resolve "individual issues, if any, remaining after resolution of class issues," (Compl., ¶ 52(F)), PCS's liability clearly turns on its common practices with respect to all employee benefit plans serviced by Oxford under its Commercial Contract. The Complaint focuses on enjoining these allegedly illegal practices and on restoring money to plans based

on plan-wide arrangements, rather than to individuals based on individualized wrongs. The Court therefore concludes that (b)(2) certification is appropriate for a class consisting of all participants, from March 5, 1995 through March 5, 1998, in ERISA-covered employee benefit plans administered by Oxford and for which PCS provided PBM services pursuant to its Commercial Contract with Oxford. Because certification under (b)(2) is appropriate, the Court need not address certification under (b)(3).

## CONCLUSION

For the reasons set forth above, the Court finds Mulder has established that certification is appropriate under Federal Rule of Civil Procedure 23(a) and 23(b)(2) of a class consisting of all participants, from March 5, 1995 through March 5, 1998, in ERISA-covered employee benefit plans administered by Oxford and for which PCS provided PBM services pursuant to its Commercial Contract with Oxford.

An appropriate Order follows.

## ORDER CERTIFYING CLASS

This matter having come before the Court upon Plaintiff's motion for class certification under Federal Rule of Civil Procedure 23 of a class consisting of all beneficiaries of Defendant covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, during the period from March 5, 1995 through March 5, 1998; and the Court having reviewed the parties' submissions and heard oral argument on February 3, 2003; and for good cause shown;

It is on this 17th day of July 2003 hereby ORDERED that the Court **GRANTS** certification of a more limited class consisting of all participants, from March 5, 1995 through March 5, 1998, in ERISA-covered employee benefit plans administered by Oxford Health Plans, Inc. ("Oxford") and for which Defendant provided pharmaceutical benefit management services pursuant to its Commercial Contract with Oxford as defined in the Opin-

ion accompanying this Order and filed this day.